250 So.2d 29 (1971)
COLLINS PIPELINE COMPANY
v.
NEW ORLEANS EAST, INC.
No. 4372.
Court of Appeal of Louisiana, Fourth Circuit.
June 7, 1971.
Rehearings Denied July 15, 1971.
*30 Shotwell, Brown & Sperry, Burt W. Sperry, Monroe, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Ernest A. Carrere, Jr., and Gerald N. Sims, New Orleans, for plaintiff-appellee.
Clay, Coleman, Dutrey & Thomson, James J. Coleman, Jacob J. Meyer and Louis J. Dutrey, New Orleans, for defendant-appellant.
Before CHASEZ, GULOTTA and BOUTALL, JJ.
CHASEZ, Judge.
This is a suit for expropriation of a pipeline servitude. Collins Pipeline Company, plaintiff-appellee, is seeking to expropriate a servitude from New Orleans East, Inc., defendant-appellant, for the purpose of constructing a 16 inch petroleum pipeline from a point near Meraux, Louisiana to a point near Collins, Mississippi. The pipeline travels for a distance of approximately six miles through property owned by New Orleans East, Inc.
Negotiations were conducted in an attempt to acquire the proposed pipeline without success and the matter went to trial.
The lower Court granted a judgment of expropriation to Collins which fixed just compensation at $135,000.00 and required Collins to lower the pipeline in four designated locations to a depth which would accommodate future drainage canals. Severance damages were denied, the trial judge holding that no severance damages had been proven. New Orleans East, Inc., has appealed from the judgment and has listed several assignments of error. Collins Pipeline Company answered the appeal asking that the just compensation be reduced from $135,000.00 to $77,067.95.
*31 New Orleans East, Inc. has assigned the following as errors made by the trial court:
"1Permitting Collins to make an oral instanter amendment of its petition for expropriation without requiring service of process of a written amendment and granting legal delays to respond.
"2Holding that Collins had the right to expropriate NOE's property after finding Collins did not have the right to expropriate under Title 19 of the Louisiana Revised Statutes of 1950.
"3Concluding that Collins was a common Carrier of petroleum products under the provisions of LSA-R.S. 45:251 with the right to expropriate notwithstanding uncontradicted evidence that Collins is merely the alter ego of Tenneco and Murphy who are not common carriers of petroleum products and who are not authorized to expropriate property.
"4Concluding that Collins proved a public purpose for the taking of NOE's property.
"5Concluding that the value of the permanent easement was $120,000.00; the value of the temporary easement was $6,000.00; and the value of the extra work space was $9,000.00.
"6Failing to award severance damages to NOE notwithstanding uncontradicted expert testimony which indicated that NOE's land sustained a substantial diminution in value immediately following the proposed taking, and notwithstanding the fact that neither of Collins' experts made any severance damage study whatsoever.
"7Failing to condemn Collins to pay all costs of this proceeding, which should include the fees of NOE's expert witnesses."
Considering assignments of error numbers one and two together, we find that the permission to file an instanter oral amendment to the petition was within the discretion of the trial judge. Granting the amendment was, however, not necessary and was most likely done through an excess of caution.
Various exceptions were filed by New Orleans East and were disposed of with the following exception:
"(f) Alternatively, plaintiff is not authorized to expropriate defendant's property under the provisions of LSA-R.S. 19:1, et. seq., for the reason that plaintiff does not qualify under any of the categories particularized under LSA-R. S. 19:2; * * *"
LSA-R.S. 19:2 supplies a list of corporations who may expropriate and Collins Pipeline Company, a Corporation which will transmit petroleum products through its line is concededly not included in the exclusive list. However, a reading of plaintiff's petition indicates that Collins was not attempting to be included in the list of corporations in R.S. 19:2.
Allegations four and five of its petition read as follows:
"4. That Plaintiff, among other things, is authorized under its charter to construct, operate and maintain pipelines, with fittings and appliances, for the transportation of petroleum, and all by-products thereof, which can be transported through a pipeline and is a common carrier pipeline created for the purpose of piping and transporting petroleum for hire, all within the meaning of L.R.S. 45:251.
"5. That in accordance with the provisions of L.R.S. 45:254 Plaintiff has the right to acquire rights of way to accommodate its pipelines by expropriation in situations where a price cannot be agreed upon with the owner of the property which Plaintiff seeks to cross and that the procedure to be followed is set forth in L.R.S. 19:1, et seq."
*32 Plaintiff argues, and it seems clear, that it is authorized to expropriate, not under title 19 of the Revised Statutes but under R.S. 45:251, 254, and that only the method of expropriation to be used is found under title 19.
The jurisprudence will support plaintiff's contention that R.S. 19:1 et seq. is the general expropriation law of our state. In Humble Pipe Line Co. v. Wm. T. Burton Industries, Inc., 253 La. 166, 217 So.2d 188 (1968) the Supreme Court stated:
"The record discloses that Humble Pipe Line Company, a common carrier pipe line company (LSA-R.S. 45:251), filed this expropriation suit under the general expropriation laws of Louisiana (LSA-R.S. 19:1 et seq.) to obtain second-line rights (8.01 acres) across defendant's lands.1"
"(Footnote omittedemphasis added)
* * * * * *
"The right of expropriation demanded by plaintiff is a compulsory right. As early as 1870, the Civil Code in Book III provided for the compulsory transfer of property. Article 2630, relating to proceedings in expropriation, provides what the petition for expropriation shall recite and that it shall conclude, `with a prayer that the land be adjudged to such corporation upon the payment to the owner of all such damages as he may sustain in consequence of the expropriation of his land for such public work. All claims for land, or damages to the owner caused by its expropriation * * * shall be barred by two years' prescription. * * *' Article 2632 provides in part, `* * * a jury7 * * * shall * * * determine, after hearing the parties and their evidence, what is the value of the land described in the petition with its improvements, and what damages, if any, the owner would sustain, in addition to the loss of the land, by its expropriation. * * *' These provisions are virtually the same as those set forth in Footnote 1, supra, (LSA-R.S. 19:2.1, subds. A(3) B) which were adopted many years later. Plaintiff, a pipe line company, exercised its rights under LSA-R.S. 45:254, supra, which provides that the expropriator shall proceed under the present state expropriation laws for use in its common carrier pipe line business. See, LSA-R. S. 19:1 et seq."
(Footnote omitted but is to the effect that R.S. 19:4 abolished trial by jury in expropriation cases.)
In Sabine River Authority, State v. Phares, 245 La. 534, 159 So.2d 144 (1963) the Court in discussing the constitutionality of certain provisions created in the Sabine River Authority stated:
"The general laws of expropriation in this State are embodied in Title 19, Sections 1 through 14 of the Revised Statutes, LSA, LSA-Civil Code Articles 2626 through 2641 and the pertinent jurisprudence. The law which the legislature made applicable to the Sabine River Authority, and which it has invoked here, is special in character and therefore the use of it by Sabine River Authority transcends the scope of the constitutional limitations which require the Authority to expropriate under the general law."
Finally, LSA-R.S. 45:254 states in pertinent part:
"All persons included in the definition of common carrier pipe lines as set forth in R.S. 45:251 have the right of expropriation with authority to expropriate private property under the state expropriation laws for use in its common carrier pipe line business, * * *" (Emphasis added)
R.S. 45:251 defines "common carrier" as follows:
"`Common carrier' includes all persons engaged in the transportation of petroleum as public utilities and common carriers for hire; or which on proper *33 showing may be legally held a common carrier from the nature of the business conducted, or from the manner in which such business is carried on."
It is apparent then that a common carrier pipeline may expropriate under R.S. 45:254 by using the "State expropriation laws" which the Supreme Court has held to be R.S. 19:1 et seq. which is exactly the format followed in allegations four and five of plaintiff's petition. It was, therefore, unnecessary for the trial court to allow plaintiff to orally amend his pleadings instanter and we will, thus, pretermit any prolonged discussion as to whether the trial court acted properly in allowing the instanter amendment. Suffice it to say that under LSA-C.C.P. art. 1151 the trial judge had the discretion whether to allow plaintiff to amend and there is no indication that this discretion was abused in the matter before us.
Because Collins' pipeline begins in Louisiana and terminates in Mississippi it is regulated by the Interstate Commerce Commission rather than by the Louisiana Public Service Commission. However, this does not preclude Collins from expropriating under the authority of R.S. 45:251, 254 because 45:251 includes "all persons engaged in the transportation of petroleum" and does not restrict "persons" to intrastate carriers. See Dixie Pipeline Company v. Barry, La.App., 227 So.2d 1 (3rd Cir. 1969); writs refused 255 La. 145, 229 So. 2d 731 (1970).
Moreover, under the provisions of the Interstate Commerce Act's general provisions pertaining to pipeline carriers and others, plaintiff comes within the definition of a common carrier under 49 U.S.C. A. Sec. 1(1) (b) and Sec. 1(3) (a), which provide as follows:
"§ 1(1) (b) The provisions of this chapter shall apply to common carriers engaged in
(b) The transportation of oil or other commodity, except water and except natural or artificial gas, by pipe line, or partly by pipe line and partly by railroad or by water.

and
"§ 1(3) (a) The term `common carrier' as used in this chapter shall include all pipe-line companies; express companies; sleeping-car companies; and all persons, natural or artificial, engaged in such transportation as aforesaid as common carriers for hire. * * *"
In the case of Champlin Refining Co. v. United States, 329 U.S. 29, 67 S.Ct. 1, 91 L.Ed. 22 (1946) rehearing denied; 329 U. S. 831, 67 S.Ct. 363, the Court held that Champlin, who was the sole owner of the products transported through its line in interstate commerce, was a "Common Carrier" under the Interstate Commerce Act and gave its reasons as follows:
"* * * The controlling fact under the statute is transporting commodities from state to state by pipe line. Admittedly Champlin is not a common carrier in the sense of the common law carrier for hire. However, the Act does not stop at this but goes on to say that its use of the term `common carrier' is to include all pipeline companiesa meaningless addition if it thereby included only what the term without more always had included. While Champlin technically is transporting its own oil, manufacturing processes have been completed; the oil is not being moved for Champlin's own use. These interstate facilities are operated to put its finished products in the market in interstate commerce at the greatest economic advantage."
See also Valvoline Oil Co. v. United States, 308 U.S. 141, 60 S.Ct. 160, 84 L.Ed. 151 (1939).
It seems clear then that Collins is a "common carrier" under both the Federal and State authorities.
*34 Moving to appellant's third assignment of error that Collins is merely the alter ego of Tenneco and Murphy Oil Companies, who are not common carriers, we find no merit in this argument.
The evidence and testimony of Mr. Harry J. Harsch, president of Collins Pipeline Company will show that Collins Pipeline Company is a corporation organized under the laws of Delaware, authorized to do business in Louisiana and Mississippi. The purposes of the corporation are to produce and transport oil, petroleum, petroleum by-products and any and all liquids, both for itself and for other persons and corporations, as a common carrier for hire or otherwise.
While it is true that Tenneco owns 80% of the stock of Collins and Murphy owns the remaining 20%, it does not follow that they may use the pipeline for their own private purposes. Being an interstate pipeline and falling within the jurisdiction of the Interstate Commerce Commission, Collins Pipeline Company is required to comply with its regulations. These regulations insure that the public will have access to the pipeline and, thus, adequately curtail any private designs of Murphy and Tenneco.
Appellant has further alleged that Collins failed to prove a public purpose for the taking of the property in conformity with Article I, sec. 2 of the Louisiana Constitution. For reasons similar to those expressed above, we do not agree with this contention.
Mr. Harsch testified that due to the rapid growth of the refining industry along the Gulf Coast that there existed a definite shortage of pipeline capacity out of the area. He further testified that according to feasibility studies a pipeline was the most efficient method of transporting the petroleum products. Based on these studies Collins proposed to construct a pipeline from the Tenneco and Murphy refineries to Collins, Mississippi where it would tie into a tank farm located there. At that point the petroleum would be then transhipped by Colonial Pipeline and Plantation Pipeline throughout the Southeastern portion of the United States as well as to the middle Atlantic states and would ultimately be distributed to consumers such as service stations, industrial users, oilfields and homeowners.
Because Tenneco and Murphy will be the initial users of the pipeline the original capacity will be approximately 70,000 barrels a day. This capacity can be increased to approximately 100,000 barrels per day by making changes in the original pump station and could be increased to 130,000 barrels per day by addition of an intermediate pump station.
Merely because Tenneco and Murphy are to be the original users of the pipeline, this is not to say that they will be the only users. In fact 49 U.S.C. § 1(4) requires the common carrier to allow third parties to use the pipeline. The common carrier is required to publish tariffs and reasonable regulations to be kept on file with the Interstate Commerce Commission as public records and are available to other carriers.
Mr. Harsch further testified that since Tenneco and Murphy had the basic need to ship products out of the area they would provide a base load which, "makes it feasible to build the line for use of the general public, as a common carrier for transportation of the petroleum products for that area again [sic] up to Collins."
Moreover, Mr. Harsch testified that Standard Oil of Kentucky, Shell Oil Company and Triangle Refineries have expressed some interest in using the line once it is completed. His testimony was further to the effect that if requests by shippers exceeded Collins' pipeline capacity, then the pipeline would be used on an allocation basis. In other words, a percentage basis for each shipper according to its needs would be used.
The public purpose is, we think, no less served because the pipeline initially will be *35 used by only two carriers. If this were reason to reject its qualifications as a public carrier, it would be very difficult, if not impossible for any new common carrier pipeline for delivery of petroleum products to qualify as a common carrier.
It has been held on numerous occasions that:
"It is not the number of persons who initially contract for use of the line, nor the number who might actually use it at any given time, which determines its public character, but rather the extent of the right to its use by the public." Texas Pipeline Company v. Stein and the numerous authorities cited therein, La. App., 190 So.2d 244 (4th Cir. 1966) reversed on other grounds 250 La. 1104, 202 So.2d 266 (1967).
Based on the above showing we find that Collins Pipeline is a common carrier and that it has authority to expropriate the servitude needed for its pipeline and has shown beyond any doubt that a public purpose will be served.
With regard to quantum the trial court placed a value on the permanent servitude of $120,000.00. On the temporary servitude required to complete the project he placed a value of $6,000.00, and $9,000.00 was awarded for the extra work space needed to complete the work for a total of $135,000.00.
Two real estate appraisers testified for plaintiff and two for defendants. Their respective qualifications are similar and uncontested, and we consider them of equal competence as experts for the appraisal of the land in question.
The property involved is a contiguous tract of land comprising approximately 31,000 acres owned wholly by New Orleans East, Inc. The land is presently undeveloped for the most part, the area through which the pipeline will lie not having been developed at all, and is more or less swampy in nature. The pipeline will traverse the land in, generally, a north-south direction for a distance of approximately six miles. The temporary servitude will be fifty feet wide but after completion the permanent servitude will revert to thirty feet in width. There is no evidence that Collins did not select the shortest, or most direct route through the property. All of the appraisers employed the accepted method of use of comparable sales to the extent that sales have been made in the general area. There was some lack of proximity in many of the comparables but because of the undeveloped status of the property this was to be expected and the sales nonetheless qualify as comparables.
There was a wide divergence in value placed on the land taken by the respective appraisers. For plaintiffs, Mr. Max Derbes valued the permanent servitude at $61,721.70, the temporary servitude at $5,996.61 and the extra work area at $9,349.64 for a total of $77,067.95. Mr. Charles C. Deano placed the value of the permanent servitude at $89,549.00, the temporary servitude at $7,565.00 and the extra work area at $9,403.00 for a total of $106,517.00.
For New Orleans East, Inc., Mr. E. A. Tharpe valued the permanent servitude at $143,086.00, the temporary servitude at $10,389.00 and the extra work area at $14,237.55, for a total value of $167,713.45. Mr. Stanley F. Miller, Jr. valued the permanent servitude at $144,187.00 and lumped the temporary servitude and extra work area into one figure at $32,400.00 for a total value of $176,587.00.
The trial judge felt that because of the wide variance in value placed on the land by the respective appraisers he should make his own determination rather than rely exclusively on the value made of the appraisers. In his words:
"The question of the value of the permanent servitude is one which is so varied that the Court has to call upon its own judgment to try to figure out what would be a fair amount for the permanent servitude and the temporary servitude and the work space. Considering *36 all of the experts and considering the knowledge that they had and the demeanor they had on the stand, the manner in which they impressed the Court, taking all these matters into consideration, the Court believes for the permanent easement and the working space and the temporary working space, the Court fixes the value of that of $135,000."
The $135,000.00 value placed on the land by the judge was designated as $120,000.00 for the permanent servitude, $6,000.00 for the temporary servitude and $9,000.00 for the extra work space.
This total value is slightly less than the average of the four separate appraisals. The trial judge appeared to give more weight to the testimony of Collins' appraisers which would account for the slightly lower than average value.
After having analyzed the comparables offered by all the appraisers and considering the basis upon which the trial judge concluded that the servitude taken was worth $135,000.00 we can find no criticism in his award. We find no manifest error in the amount awarded and any alteration by us would be merely substituting our judgment for that of the trial Court's which appellate courts of this state are loath to do. Therefore, the award of $135,000 as total value of the servitude taken is affirmed.
The most serious issue raised by this appeal is the question of severance damages. The trial judge disallowed any severance damages whatsoever. Experts for Collins made no severance damage study at all. Experts for New Orleans East, Inc. made studies and determined that the entire 31,000 acre tract of land had sustained a substantial diminution in value immediately following the proposed taking.
Both Mr. Tharpe and Mr. Miller for New Orleans East, Inc. arrived at a value for the entire tract of land immediately before and immediately after the taking. Mr. Tharpe determined that the severance damage due was $1,032,033.00; Mr. Miller estimated the severance damage to be $855,813.00. Both experts were firmly of the opinion that the entire property would be diminished in value. Under cross-examination they held to that position and refused to consider any other possibility. We think that this was the primary reason for the trial court's refusal to award any severance damages.
By examining the exhibits, it can be clearly seen that there is an existing drainage canal running in a north-westerly direction through defendant's property. From the exhibits, it is to be noted that the proposed pipeline follows the contours of this canal and the permanent easement sought is partly within the confines of the right-of-way held by the Sewerage and Water Board of New Orleans for the maintenance and operation of this canal. The pipeline lies to the west of the canal and Messrs. Tharpe and Miller contend that the pipeline will have an effect on the value of the property lying east of the canal as well as that west of the canal. Moreover, by contending the entire property will be diminshed in value, they project that property located as far as two or three miles from the pipeline will suffer because of the pipeline. Defendant's appraisers likened the pipeline to a barrier being "similar to the defensive walls of a medieval city, or the Inner Harbor in old New Orleans."
This "barrier" theme might possibly be valid for a smaller tract of land such as a small residential subdivision, but to say that the presence of the pipeline will inhibit development to the east of its escapes all reasonableness.
This is not to say, however, that no severance damages were suffered. We find the trial judge to have been in error in disallowing all severance damages.
It has long been held by the jurisprudence of our state that gasoline pipelines *37 are dangerous and have the psychological effect of deterring prospective purchasers, which has the effect of impairing the market value of the property. Texas Pipe Line Company v. Barbe, 229 La. 191, 85 So.2d 260 (1955); Texas Pipe Line Co. v. National Gasoline Co., 203 La. 787, 14 So.2d 636 (1943). Evidence that there is no real danger or reason to fear any danger is virtually irrelevant and has no force against the fact that the fear exists and is unavoidable. The fear of danger in some cases is as bad as the danger itselfit is a conditionnot a theory. Texas Gas Transmission Corporation v. Broussard, 234 La. 751, 101 So.2d 657 (1958); Texas Pipe Line Company v. National Gasoline Co., supra; Coastal Transmission Corporation v. Lejeune, La.App., 148 So.2d 111 (3rd Cir. 1962).
In light of these above mentioned factors, if we take into consideration that the property abutting the pipeline is variously zoned in places as commercial, residential, industrial and heavy industrial, it seems clear that the property adjacent to the pipeline has suffered some diminution in market value.
There is authority in our jurisprudence for this court to make a determination that the entire 31,000 acre tract did not suffer, but that a strip contiguous to the servitude was damaged by construction of the pipeline. See Michigan Wis. Pipe L. Co. v. Sugarland Develop. Corp., La.App., 221 So. 2d 593 (3rd Cir. 1969); Colonial Pipeline Company v. Babineauz, La.App., 154 So.2d 594 (3rd Cir. 1963).
Considering all the attendant circumstances, we think the ends of justice would best be served by remanding this case to the trial court for a determination of the amount of severance damages due. We do this because, as previously stated, Collins' experts made no severance damage study which would aid us in reaching a realistic amount of severance damages. New Orleans East, Inc.'s experts considered only the entire tract as suffering damages and did not consider severance damages to a strip contiguous to the pipeline. Therefore, there is no evidence on which we could base an amount due in severance damages although we do conclude that some severance damages are due.
Of course to be considered in determining the value of the servitude are, among other things, the differences in zoning along the pipeline, the possible use as parking spaces over the pipeline and the fact that the pipeline will overlap in some areas on an existing servitude of the Sewerage and Water Board. Another factor is that the present existence of the Southern Natural Gas pipeline on the property of New Orleans East, Inc. does not in itself preclude further severance damages to the property. In fact, the reverse may be true two pipelines may be more dangerous than one. See Michigan Wis. Pipe L. Co. v. Sugarland Develop. Corp., supra; Michigan Wisconsin Pipe Line Co. v. Bonin, La.App., 217 So.2d 741 (3rd Cir. 1969); Michigan Wisconsin Pipe Line Co. v. Angelle, La.App., 217 So.2d 748 (3rd Cir. 1969).
Therefore, under the authority of LSA-C.C.P. art. 2164 and Texas Pipeline Company v. Barbe, 229 La. 191, 85 So.2d 260 (1956), we will remand this case to the trial court to permit the defendants to establish by competent evidence the difference in market value immediately before and immediately after the taking of a strip of land contiguous to the pipeline and to a reasonable depth on either side of the pipeline, which value will be considered as severance damages.
The final issue to be resolved is which party should bear the costs of these proceedings.
Civil Code article 2638 provides:
"If a tender be made by any corporation of the true value of the land to the owner thereof, before proceeding to a forced expropriation, the costs of such proceedings shall be paid by the owner."
*38 LSA-R.S. 19:12 provides:
"If a tender is made of the true value of the property to the owner thereof, before proceeding to a forced expropriation, the costs of the expropriation proceedings shall be paid by the owner."
Thus, it would seem that unless a tender is made, the expropriator should bear the costs of the proceeding including defendant's expert witness fees; this done under the rationale that costs are part of the "just and adequate compensation" guaranteed by Article I, sec. 2 and Article IV, § 15 of the Louisiana Constitution.
In expropriation proceedings all costs expended by defendants are assessable against the condemning authority unless a tender of the true value of the property has been made before proceeding to a forced expropriation. Orleans Parish School Board v. Brown, 245 La. 792, 161 So.2d 274 (1964); City of Monroe v. Nastasi, La.App., 175 So.2d 681 (2nd Cir. 1965); State v. Rownd, La.App., 119 So.2d 282 (Orleans Appeals, 1959). The condemning authority is also taxed with the reasonable costs of the testifying expert witnesses retained by the landowner to help him obtain his just compensation. Fees to be paid such expert witnesses are based not only upon their appearance in court, but also upon preparatory work done by them. State, Dept. of Hys. v. William T. Burton Indus. Inc., La.App., 219 So.2d 837 (3rd Cir. 1969), writ refused 254 La. 14, 222 So.2d 67 (1969); Sterkx v. Gravity Drainage Dist. No. 1 of Rapides Par., La. App., 214 So.2d 552 (3rd Cir. 1968), writ refused 252 La. 964, 215 So.2d 130 (1968).
We can find no evidence of a tender made by Collins. The trial judge properly refused evidence which would have established a "final offer" by Collins because unless there was a tender Collins could not avoid court costs. Therefore, it was error for the trial court to cast each party for its own costs and this portion of the judgment will be reversed and remanded for a determination of costs, including expert witness fees to be paid by Collins.
For the assigned reasons, the portions of the lower court's judgment disallowing severance damages and casting each party for its own costs is reversed and the case is remanded to the court a quo with instructions to proceed as set out hereinabove to determine the amount of severance damages due to New Orleans East, Inc. and to determine and cast as costs defendant's expert fees. In all other respects the judgment is affirmed. Costs in lower court and this court are assessed to Collins Pipeline Company.
Affirmed in part, reversed in part, and remanded.