UNITED STATES of America, Appellee,

v.

**62.61 ACRES OF LAND, MORE OR LESS, IN the CITY OF VIRGINIA BEACH, COMMONWEALTH OF VIRGINIA, et al., Appellants.**

No. 76–1325.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6, 1976.

Decided Jan. 18, 1977.

Joseph J. Lawler, Norfolk, Va. (James M. Pickrell, Kellam, Pickrell & Lawler, Norfolk, Va., on brief), for appellants.

Carl Strass, Atty., Dept. of Justice, Washington, D.C. (Peter R. Taft, Asst. Atty. Gen., Washington, D.C., William B. Cummings, U. S. Atty., and William M. Norris, Atty., Dept. of Justice, Alexandria, Va., on brief), for appellee.

Before WINTER, BUTZNER, and HALL, Circuit Judges.

K. K. HALL, Circuit Judge.

Lacy L. Redd and M. Virginia Redd (hereinafter the "Redds") appeal one aspect of a final judgment in a United States condemnation suit. The district court held that they had no compensable interest in a certain stone jetty extending from their land out into the Chesapeake Bay. We affirm.

Jurisdiction of this court rests on 28 U.S.C. § 1291.

In opening up Little Creek on the south shore of Chesapeake Bay as a water rail terminal to accommodate deep draft vessels, the N.Y.P. & N.R.R. (Pennsylvania Railroad), in 1927, acting under the authority of a permit from the federal government, constructed two large stone jetties which thrust out approximately 800 feet into the Chesapeake Bay to protect the Little Creek channel on its east and west sides from ravages of storms and waves.

In 1965, the Redds acquired property along the west side of Little Creek to which the western jetty abutted. In this condemnation suit, filed in 1973, the United States described Parcel "C" owned by the Redds as ". . . containing 0.57 acre, more or

less, together with the western jetty extending northerly approximately 800 feet into Chesapeake Bay."

In July of 1974, the district court found that the Redds were not entitled to compensation for 40.90 acres of submerged land. This court affirmed on an interlocutory appeal. By dominant navigational servitude secured by the Commerce Clause, Article 1, Section 8 of the United States Constitution, the government was deemed entitled to exercise its right of eminent domain over the submerged land without paying compensation therefor.

Subsequently, the trial court held that the Redds had no compensable interest in the jetty,[1] and refused to permit them to present evidence of its value or their right to compensation for it. They were granted an award by the jury for their shore land. The Redds appeal only the issue of ownership of the jetty and the right to compensation therefor. We agree with the lower court that the Redds have no compensable interest.

It is conceded by the Redds that the jetty was not included in the expressed metes and bounds description of the property conveyed to them by Penndel Corporation (the Railroad's successor) in 1965. The eastern and northern boundaries, as specifically set forth in the deed, are limited to the low water line of the Chesapeake Bay. The jetty is beyond that line. The claim is made, however, that the jetty would be included in this "catch-all" language of the deed:

"Also all the estate, right, title and interest of the party of the first part herein of, in and to the muds, flats and land under the waters of the Chesapeake Bay abutting the hereinbefore described parcel of land on the North and extending as far into the said Bay as such estate, right, title and interest extends or should extend by law or custom and all riparian rights appertaining thereto."

■ We affirm the district court finding that the Redds acquired no interest in the jetty by virtue of the deed to them. The only interest their grantor had was that of a permittee under the permit to construct the jetty issued in 1927. The above catch-all clause is expressly limited to any estate, right, title or interest that Penndel had in "muds, flats, and land under the water of Chesapeake Bay." In fact, Penndel had no interest to either hold or convey. Although the railroad had the authority to construct the jetty, it held a nonconveyable easement in the real estate.

■ Judge MacKenzie was correct in stating, "The land on the bottom of the Chesapeake Bay is owned, and always has been by the State of Virginia. Code of Virginia, 1950, Section 62.1–1. Any rights by statute, or at common law, to extend a wharf or pier are not to be equated to a stone jetty."[2] While compensable ownership of a wharf is normally covered by riparian rights,[3] the same cannot be said of a stone jetty used solely for stream navigation and current deflection.[4] Wharves and piers are built from the shore outward into the water for the purpose of reaching navi-

---

1. Value of the western jetty to which the Redds claim ownership is estimated to exceed $1,000,000.

2. Generally speaking, a wharf is similar to a pier, if not synonymous. Their purpose is well described in *Atlee v. Packet Co.,* 88 U.S. 389, at 393, 22 L.Ed. 619 (1874):
   "Wharves and piers are as necessary almost to the successful use of the stream in navigation as the vessels themselves, and are to be considered as an important part of . . . commerce. But to be of any value in this respect they must reach so far into deep water as to enable the vessels used in ordinary navigation to float while they touch

them and are lashed to their sides. They must of necessity occupy a part of the stream over which a vessel could float if they were not there."

3. See *United States v. Smoot Sand & Gravel Corp.,* 248 F.2d 822, 826 (4th Cir. 1957).

4. Likewise, constructing a stone jetty for the purpose of protecting the entrance to a dredged channel cannot come within the right of a riparian owner to "wharf out" recognized at common law and also by statute. Code of Virginia, 1950, Section 62.1–164 (Supp.1973).

gable waters.[5] Some are anchored to the water's floor by pilings while others float on the surface of the water by some floating device. This stone jetty, however, is built from the bay bed upward and thus incorporated into the real estate of the water's floor, rather than being a mere appurtenance to the shore as a wharf or pier is generally thought to be.[6] The most significant difference, though, is the purpose for which a wharf and a stone jetty of this nature are designed. While a wharf is generally used for loading and unloading water vessels, this jetty's primary function is to protect a channel entrance. Thus, we cannot agree with the Redds' contention that riparian rights give them ownership or a compensable interest in the jetty.

In 1971, the United States Coast Guard sought to construct and maintain a light on the western jetty. After some correspondence between the Coast Guard, the Corps of Engineers and the Navy concerning ownership of the jetty, it was concluded that the Redds owned it. After construction of the light, rent was paid to the Redds pursuant to a lease for maintaining the light on "their" property. The Redds cite this as strong evidence of their proper ownership.

The government has admitted that in the Coast Guard's haste to establish the light on the jetty a mistake was made as to ownership of the jetty. While we frown on such oversight, we will not hold the government to their own mistake which resulted in rental benefits to the Redds.

The Commonwealth of Virginia was a party to this suit and received notice of the hearing scheduled in November of 1975 concerning ownership of the jetty. By letter dated November 13, 1975, addressed to Judge MacKenzie, two Assistant Attorneys General of the Commonwealth of Virginia advised the court that the state had no title to or interest in the subject jetty. The Redds argue this as a strong indication of their ownership. Although such information is evidence, the advisory opinion from the Commonwealth of Virginia is neither conclusive of the state's ownership nor the Redds'.

We agree that the Redds have no claim to the jetty as owners, nor for compensation therefor under any theory.

*AFFIRMED.*

---

5. See *Weems Steamboat Co. v. People's Co.*, 214 U.S. 345, 29 S.Ct. 661, 53 L.Ed. 1024 (1909), where rights of riparian owners in Virginia are discussed.

6. There are exceptions, of course, to the design of wharves, piers, and jetties. Some wharves are built of stone or concrete from the water's floor upward, but the real distinction is the purpose for which it is used.