[No. 2992–1–III.  Division Three.  May 27, 1980.]

THE STATE OF WASHINGTON, *Appellant,* v. DONALD M. EVANS, ET AL, *Respondents.*

*Slade Gorton, Attorney General, Joseph B. Loonam* and *Charles F. Secrest, Assistants,* for appellant.

*Alan A. McDonald, Bryan G. Evenson,* and *Halverson, Applegate & McDonald,* for respondents.

MUNSON, J.—In this condemnation action, a jury awarded Donald M. Evans[1] $400,000 for the State's taking of 17.58 acres and severance damages to his feedlot because of the construction of Interstate Highway 82 east of Prosser. The State appeals from the judgment entered upon the verdict.

Evans owned 746.67 acres of land consisting of 645.43 acres of undeveloped dry land, 61.29 acres of land devoted to commercial or light industrial, 26.95 acres of irrigated pasture, 12 acres of plum and prune orchards and 1 acre of grapes. Approximately 57.5 acres of the 61.29 acres devoted to commercial or light industrial consisted of two cattle feedlots and improvements. The north feedlot abutting the area of the "take" is the lot in issue, as well as an adjacent

---

[1]Although the additional respondents named above are parties to this action, we refer only to respondent Donald M. Evans.

feed mill which was located on land not owned by Evans. During the trial the jury had an opportunity to view the property.

Two issues central to this appeal involve (a) the status of the feed mill in conjunction with the feedlot, and (b) the value of the feedlot before and after the taking.

The State frames its first contention as follows:

The Court committed reversible error by allowing testimony which included the value of the feedmill in the overall value of the subject property absent proof that the respondents had an enforceable interest in the property upon which the feedmill was located.

Evans had leased land adjacent to his own property from Burlington Northern Railroad for about 10 years. On the leased land he built a feed mill where he mixed feed for the cattle in his feedlots. At trial, the State claimed that the land on which the feed mill was located did not belong to Burlington Northern Railroad, but was owned by the United States Bureau of Reclamation. The trial court did not allow the State to raise that issue because neither the Bureau of Reclamation nor the railroad was a party and any adjudication of title would not bind either party.

■ Before addressing the status and value of the feed mill, we set forth some basic principles on the taking of private property by the State. Private property may not be taken or damaged for public use without just compensation. Const. art. 1, § 16 (amendment 9). In *Lange v. State,* 86 Wn.2d 585, 589-90, 547 P.2d 282 (1976), the court made several significant statements regarding compensation:

[J]ust compensation derives as much content from the basic equitable principles of fairness . . . as its does from technical concepts of property law." *United States v. Fuller,* 409 U.S. 488, 490, 35 L. Ed. 2d 16, 93 S. Ct. 801 (1973); . . .

. . . forced to sell, he is not to receive by reason of that fact a lesser amount than the property would fairly bring upon the market." *Chelan Elec. Co. v. Perry,* 148 Wash. 353, 358, 268 P. 1040 (1928). In carrying out our duty to

achieve fairness in condemnation awards, we have recognized that just compensation must be calculated from the standpoint of what the property owner loses by having his property taken, not by the benefit which the property may be to the condemnor. . . .

. . .

. . . [J]ust compensation is to be determined by equitable principles and . . . its measure varies with the facts." . . .

In the usual eminent domain proceeding, the property is valued as of the date of the trial.

(Citations omitted.)

■ The State is required to pay damages not only for that part of a tract taken but is also required to pay for that "diminution in value of the remainder area by reason of the severance therefrom of the parcel appropriated . . ." 4A J. Sackman, *Nichols' Law of Eminent Domain,* § 14.1(3), at 14–33 and § 14.21 (rev. 3d ed. 1976); *Idaho & W. Ry. v. Coey,* 73 Wash. 291, 131 P. 810 (1913); *cf. United States v. Miller,* 317 U.S. 369, 87 L. Ed. 336, 63 S. Ct. 276, 147 A.L.R. 55 (1943).

For a property owner to be entitled to severance damages, the courts usually require three elements: ownership, use, and contiguity. Here, the State concedes that as to the entire 747 acres, there are severance damages. However, the State contends that as to the land upon which the feed mill is located, there is a lack of unity of ownership; thus, Evans could not claim damages to the feed mill. *State v. Lacey,* 8 Wn. App. 542, 507 P.2d 1206 (1973).

We agree with the authority cited by the State that before one may maintain a claim for compensation in an eminent domain proceeding, one must have an enforceable interest, *State v. J.R. Leasing Co.,* 1 Wn. App. 944, 466 P.2d 185 (1970), and the proper procedure is to determine as a preliminary question whether a condemnee has any legal rights or claim in the property for which he seeks damages. *Tacoma v. Mason County Power Co.,* 121 Wash. 281, 209 P. 528 (1922). The State need not admit or prove the nature or extent of title until trial. *Chelan Elec. Co. v.*

*Perry,* 148 Wash. 353, 356, 268 P. 1040 (1928); *Walla Walla v. Dement Bros. Co.,* 67 Wash. 186, 190, 121 P. 63 (1912). However, implicit in the State's contention here is that if the feed mill were located on the railroad property, evidence as to the use of the mill would be admissible on the issue of severance damages as an adjunct to the feedlots. Its contention here and at trial rested solely on the lack of any enforceable interest on behalf of Evans in the feed mill land. Assuming arguendo the State's contention was correct, Evans' interest in the realty, if any, was of no consequence because the State was not condemning the property upon which the feed mill was located.[2] The issue was whether a feedlot with an accessible feed mill was of greater value than one without an accessible feed mill. Both the State's and Evans' expert testified that access to a feed mill enhanced the value of the feedlot. This was a proper matter for the jury to consider in determining just compensation of severance damages. *State ex rel. State Highway Comm'n v. Gray,* 81 N.M. 399, 467 P.2d 725 (1970).

▮ The State's motion in limine and its objection during trial to evidence regarding the feed mill was based *solely* on Evans' lack of title to the land on which the mill was located. The State did not contend at trial, and does not directly contend here, that the value of the mill was irrelevant to the issue of damages. Testimony was admitted, without objection, that the value of the feedmill was $250,000 and it would cost $10,000 to move it. Neither the

---

[2]Thus, we need not decide whether unity of ownership requires that a person with an interest in two tracts have a fee simple interest in each. *See United States v. Fuller,* 409 U.S. 488, 35 L. Ed. 2d 16, 93 S. Ct. 801, 805 (1973) (dissenting opinion); *State ex rel. Symms v. Nelson Sand & Gravel, Inc.,* 93 Idaho 574, 468 P.2d 306, 313 (1970); *cf. United States v. Honolulu Plantation Co.,* 182 F.2d 172 (9th Cir. 1950), *cert. denied,* 340 U.S. 820, 95 L. Ed. 602, 71 S. Ct. 51 (1950). We note in all of the authority cited by the State, the condemnee was attempting to claim damages for real property in which he had no enforceable interest. *United States v. 62.61 Acres of Land, More or Less,* 547 F.2d 818 (4th Cir. 1977) (condemnee had no enforceable interest in a stone jetty); *United States v. 87.30 Acres of Land, More or Less,* 430 F.2d 1130 (9th Cir. 1970) (owner did not have a vested property right in revocable permits issued by the Army Corps of Engineers). *See also United States v. Fuller, supra.*

cost of moving, which is not an element of damages in this proceeding,[3] nor the market value of the feed mill as a separate entity was relevant. Notwithstanding, the State never objected to the valuation on the ground of relevancy. In *Marr v. Cook*, 51 Wn.2d 338, 341–42, 318 P.2d 613 (1957), the court stated:

> We have insisted that unless the specific ground of objection to the admission of evidence is a proper ground, the trial court commits no error in overruling it. *White v. Fenner*, (1943), 16 Wn.(2d) 226, 133 P.(2d) 270.

Without proper objection, there is no basis for appellate review. *State v. Boast*, 87 Wn.2d 447, 451, 553 P.2d 1322 (1976). After the owner testified to the value of the feed mill, the State's expert, in rebuttal, testified to his valuation less depreciation. Had the State properly objected to the owner's testimony of the value on the basis of relevancy, the rebuttal testimony would not constitute a waiver of the right to assign error at the appellate level. However, in the absence of such an objection, the State will not be permitted to raise obliquely the objection for the first time here. Therefore, the State's first contention must be rejected. We find no error.

■ The State frames its second contention as follows:

> The Court committed reversible error by allowing respondents' valuation witnesses to limit their damage testimony to only the small portion of the subject property which had been developed into a feedlot.

Evans conceded the State's appraisal value of the remaining acreage was accurate; he believed the only issue was the value of the feedlot. Evans' valuation witnesses, other than himself, were owners and operators of feedlots; so far as the record reflects, they would have no expert knowledge of the value of orchards, pasture, commercial, industrial, or undeveloped land. As to the State's contention that there was no after–value testimony of the entire property, we quote the following testimony of Evans on direct examination:

---

[3]RCW 8.26 governs relocation assistance in eminent domain proceedings.

Q . . . I have to ask you in the before situation what do you think that your place is worth?

A Are you talking about the feed lot or the whole?

Q No, the whole thing. . . .

A Well, I believe the whole Evans' Brothers holdings in this particular mapping arrangement here is probably worth a million to a million, two.[4]

. . .

Q . . . [W]hat do you think your property, again, all of it, will be worth afterwards, after the highway is built?

A Well, I think it will be diminished by the worth of the feed lot, and it is anything connected directly with the feed lot.

Q All right, and how much in dollars? . . .

A . . . I think that feed lot is worth $450,000 right now.

. . .

Q And what will it be worth after this freeway goes through in your opinion, Don?

A I don't believe we'll have a feed lot.

Q . . . Do you feel that it will have any market value? Do you think any willing buyer informed who is not compelled to buy would be interested in buying that feed lot?

A No, sir.

We do not believe the jury should have had any difficulty in computing the before and after value of the feedlot in relation to the entire property. The jury had before it all of the essential figures. It would have been a simple matter for them to compute the amount after acquisition: $450,000 reduced to zero equals $450,000 damages. If the State had reason to believe that the after value would be different from the before value less damages, it should have examined Evans on that fact. Instead, the State chose to stand on what it perceived to be its legal right to the introduction of after–value testimony. Better practice dictates that counsel examine their witnesses in order to elicit the before value, the after value and the alleged damages of the entire property. Nevertheless, to fail to ask the critical question of

---

[4]Evans was never asked if this included the value of the feed mill; likewise, he was never asked if his valuation of the feedlot included the value of the feed mill.

the computation of the after value of the entire property was not fatal to this jury's verdict. The error, if any, was not prejudicial. The trial court properly instructed the jury that the measure of damages in a condemnation action is the difference between the fair market value of the entire property before the acquisition and the fair market value of the remainder after acquisition. *State v. Sherrill,* 13 Wn. App. 250, 534 P.2d 598 (1975).

■ Additionally, the State contends the trial court's acceptance of the testimony restricting damages to the feedlot amounts to an abandonment of the before–and–after test and erroneously permits use of the "unit rule,"[5] *i.e.,* the whole is equal to the sum of its parts. We disagree. Here, the farm was a diversified operation. In recognition of this fact, even the State's appraiser valued each area of land separately: orchard, cattle pasture, unimproved land, commercial and light industrial land. The owner did not challenge the appraisals except as to the feedlot, which became the only item in issue. The unit rule was not applied. It is recognized there are instances where an expert will not be able to evaluate or appraise the whole property. In *Berry v. State,* 103 N.H. 141, 144, 167 A.2d 437, 439–40 (1961), the court commenting on the possibility that fractional appraisals will result in false values noted:

> It is true that it may be difficult for an appraiser to segregate and ascribe to a part of an entire property a value entirely divorced from the value of the rest of it. However even though in this case the State presented the testimony of an expert concerning the before and after value of the whole property, he admitted that he went over the property "with a man who I consider eminently qualified to evaluate the standing timber." He also agreed "that at least since the taking the only way you

---

[5]*See* 4 J. Sackman, *Nichols' Law of Eminent Domain* § 12.3142[1][a], at 12–337 to 338 (rev. 3d ed. 1979), which notes: "The measure of compensation is not the aggregate of the prices of the lots into which the tract could be best divided, . . ." *Department of Highways v. Schulhoff,* 167 Colo. 72, 77, 445 P.2d 402, 405 (1968); 29A C.J.S. *Eminent Domain* § 136(8), at 562 *et seq.* (1965).

can approach the fair value of the land lying west of the Interstate is to treat it as a single unit . . . a timber lot."

Furthermore from a practical viewpoint also it may be more difficult for a jury to deal with fractional appraisals in such a way as to prevent duplication in the amount of damages awarded. However in this case the parts which were separately appraised had such distinct characteristics that the danger of duplication could be found to be at a minimum.

These are all matters to be weighed by the Trial Court in deciding whether the testimony offered will aid the jury in arriving at its decision. . . . We cannot say it was error for the Trial Court to admit such testimony in this case, or that it could not constitute the basis of a fair and just verdict.

(Citations omitted.)

We agree with the observation in *In re Mercer St., Seattle,* 55 Wash. 116, 119, 104 P. 133 (1909):

This being a condemnation proceeding in which the jury not only heard the evidence, but also viewed the property, and their verdict having been sustained by the trial judge, an utter absence of evidence to support it would be our only justification for granting a new trial.

. . . An appellate court should hesitate before setting aside the verdict of a jury in a condemnation case, and it will only make such order when it clearly appears that the verdict is unjust and unsupported by any competent evidence.

*See also State v. Wenatchee Valley Holding Co.,* 169 Wash. 535, 546, 14 P.2d 51 (1932); *Tacoma v. Hansen,* 59 Wash. 594, 110 P. 426 (1910); *State ex rel. State Highway Comm'n v. Northeast Bldg. Co.,* 421 S.W.2d 297, 302 (Mo. 1967). We find no error.

■ We address the other assignments of error summarily. The State contends the trial court erred when it admitted written leases executed by Evans on adjacent property after this action was filed. The State argues the acquisition is governed only by the state of Evans' record title at the time the condemnation was commenced. It is undisputed that Evans had oral leases with adjacent property owners which preceded the execution of the written

leases. While the State is correct that oral leases may not evidence a sufficient interest upon which a claim for severance damages may be based, *State ex rel. Wirt v. Superior Court,* 10 Wn.2d 362, 116 P.2d 752 (1941), here, at the time of trial, there was an enforceable interest—the written leases. The State was not prejudiced; we find no error.

Evans' expert witnesses testified that a reasonable buyer would not purchase a feedlot located 88 to 100 feet from a freeway because of its effect on the cattle and the effect of dust and odor of the feedlot on drivers on the highway. The State contends that because the experts' information was based upon matters discussed at cattle feeders' conventions, it was speculation and conjecture and therefore erroneously admitted. The psychological effect of an adverse condition, real or imagined, on a potential buyer may have a material influence on the market value of property. These effects and their impact on the market value have been recognized in cases involving the inherent fear of electricity and gas transmission lines. *See Kentucky Hydro–Elec. Co. v. Woodard,* 216 Ky. 618, 287 S.W. 985 (1926); *Gulledge v. Texas Gas Transmission Corp.,* 256 S.W.2d 349 (Ky. App. 1952); *Collins Pipeline Co. v. New Orleans E., Inc.,* 250 So. 2d 29, 37 (La. App. 1971); *Appalachian Power Co. v. Johnson,* 137 Va. 12, 119 S.E. 253 (1923). Evans' experts, one of whom had been in the feedlot business for over 40 years, the other for over 20 years, testified that the conditions they described definitely diminished the market value. It is not the landowner's fault the adverse conditions exist; he has been damaged in the value of his property by the mere existence of a mental attitude which had a material influence on the market value of his feedlot. *See* 4A J. Sackman, *Nichols' Law of Eminent Domain* § 14.241[1], at 14–158 (rev. 3d ed. 1979). The weight and credibility of the testimony was for the jury. We find no error in allowing these witnesses to testify to such attitudes and their effects.

The State contends the trial court erred in refusing to give the State's proposed instruction identical to WPI

150.11[6] on remote and speculative testimony. The court rejected this instruction on the basis that it was a comment on the evidence. The State argues the instruction was proper because Evans' witnesses testified to dust, odor and other environmental problems which, in the opinion of the State, was speculative testimony. We disagree with the trial court that the instruction was a comment on the evidence, but do not adopt the position of the State that merely because it is a pattern jury instruction it must be correct. Here, the jury was instructed to reach a result based upon the evidence. The State's proposed instruction was a correct statement of the law and could have been properly given. Nevertheless, considering the instructions as a whole, we find no error in the court's failure to give the instruction. *See Renton v. Scott Pac. Terminal, Inc.,* 9 Wn. App. 364, 512 P.2d 1137 (1973).

The State also contends the court erred in failing to give its instruction identical to WPI 151.05.[7] There was no evidence of business profits or losses. The closest the evidence came to the subject was testimony introduced by the State that fewer than 5,000 head of cattle were consistently fed on both feedlots. All the experts testified the value of feedlots is based upon the number of cattle that could be fed in

[6]"In arriving at the amount of compensation to be paid the respondents, you should not consider anything which is remote, imaginary, or speculative, even though mentioned or testified to by witnesses. The only elements which you should take into consideration are those which will actually affect the fair market value of the property and which are established by the evidence."

[7]"Although evidence has been introduced with reference to the business conducted upon the property being condemned, such evidence was admitted solely for the purpose of showing the use to which this property was adapted, and should be considered by you for such purpose only. You are not to consider the volume or extent of such business, if any appears, or the profits, if any, as a measure of the market value of the property. Neither should you take into consideration in determining the amount of damages to be awarded for the taking of the property condemned, any injury to such business or any loss of profits of such business, even if such injury or loss appear from the evidence. It is the real property of the respondents, not their business, which is condemned by the petitioner, and it is for this real property only that you are to award compensation."

a given feedlot; the values ranged from $65 to over $100 a head. There was no testimony relating to the cost of cattle, feed, or other business costs; likewise, there was no testimony relating to the price of cattle purchased or sold. We find no prejudicial error in not giving the instruction.

Finally, the State objects to the court's allowing Evans a peremptory challenge to a member of the original jury panel after Evans had waived his first peremptory challenge. This was error. RCW 4.44.210, relating to peremptory challenges, states in pertinent part:

[S]uch refusal on the part of the plaintiff to exercise his challenge in proper turn, shall conclude him as to the jurors once accepted by him, and if his right be not exhausted, his further challenges shall be confined, in his proper turn, to talesmen only.

The same procedure applies to defendants. It is somewhat surprising, considering the experience of counsel and the trial judge, that this issue arose. However, the error is not fatal. Parties are not entitled to have any particular juror serve. The State does not allege that any of the jurors subsequently selected were not qualified; unless prejudice results from allowing an excessive number of peremptory challenges, reversible error has not been committed. No such prejudice is cited; none is found. *Creech v. Aberdeen*, 44 Wash. 72, 87 P. 44 (1906); *see also* Annot., *Effect of allowing excessive number of peremptory challenges*, 95 A.L.R.2d 957 (1964).[8]

---

[8]We believe it necessary to note that at trial there were issues which took an equal amount of time and attention, if not more, than the value of the feedlots, with or without the feed mill, and the issues involving title. For example, another major issue presented for the jury's consideration was the cost of a drainage system for Evans' feedlot required by the Department of Ecology. Both parties put forth substantial conflicting testimony as to various plans, their costs and effect on the value of the feedlot. Amounts ranged from $35,000 to $400,000. It was the State's theory that the "cost of cure" of putting in a drainage system had a direct effect upon the market value of the feedlot. The jury was presented with a dazzling array of figures and issues. We inject this observation as a reminder that the issues before the jury tend to differ in perspective and focus from those presented to an appellate court.

Judgment affirmed.

GREEN, C.J., concurs.

ROE, J. (dissenting)—Defendants were the owners of 746.67 acres of land upon which they had one feedlot. They also operated an adjacent feedlot, at least in part, on rented land. Somewhat removed from defendants' property was a feed mill which was defendants' personal property. Defendants were not the owners of the land upon which the feed mill was located; who did own the land was in doubt, but it was not the condemnees.

The State, in this condemnation action, did not seek to take any of the feedlot pens or the feed mill but merely to move the highway closer to the feedlot improvements by condemning 17.58 acres.

The jury awarded $400,000, or approximately $22,700 per acre. The expert witnesses as to values for the State would have supported a judgment of somewhat under $140,000, testifying as to the before and after valuation of the land as a result of the take. This is the correct and only method to determine valuation of the land and improvements condemned. No evidence was given by the witnesses for the owners as to the value of the total acreage before and after the take. Rather, they sought to itemize certain elements of damages and were permitted to state that after the take the feedlot would be worth nothing because of the nearness of the proposed highway.

Defendants admit that the value of the feed mill is not a compensable item in this action, and yet, purposely and erroneously, the value of the feed mill itself, which was owned by the defendants on adjacent land of another, was

---

While our review of the record reflects some conceivable tactical errors, the failure to object being only one example, we believe the State was accorded a fair trial. Nevertheless, both sides were represented by experienced trial lawyers. What might appear to us to be tactical errors may have had reasons not readily apparent. It is not for this court to speculate on what those reasons might have been.

permitted to be introduced in evidence. Such evidence was error and clearly infected the verdict. Not only was the evidence as to the value of the feed mill itself inadmissible, confusing and misleading, but it should have been stricken at the request of counsel and the jury should have been instructed to disregard such evidence. Hence, for such error this case should be reversed.

In order to explain this conclusion, I must quote from the record at some length.

Although the objections to this evidence were not well articulated by the State, and its position was confused by reference to the ownership of the land on which the feed mill was located, nevertheless, a sufficient statement of its position is in the record.

The attorney for the condemnees, aggressively poised as to this evidence question, ingeniously was able to inject in the record at various times the value of the feed mill, approximately $250,000, and to suggest it would be a total loss after the take. There is absolutely no reason why any testimony as to the intrinsic value of the feed mill was admissible under the guise of enhancement of the feedlot.

The juxtaposition of the feed mill to the pens is properly admissible to enhance the value of the feedlot, as would nearness to any supporting utility, whether it be a road, railroad, a gas or water main, or other conveniences, but the intrinsic value of such road, railroad, gas or water main, etc., would not be admissible.

The appraisers agreed that a feedlot with a feed mill on the premises is more valuable than a lot without one. But there should not be incorporated into the award an amount to the owners of the conveniently supportive utility merely because the adjacent feedlot is being taken. Evidence of such loss is clearly inadmissible whether the condemnee or some third person owns such utility.

This problem was anticipated, though not well examined, by counsel for the condemnor seeking in a motion in limine to instruct the owners, their attorneys and witnesses not to

directly or indirectly mention, refer to, interrogate concerning, or attempt to convey to the jury in any manner "any *evidence* or *opinion* which includes any lands not owned by the respondents in defining the single larger parcel for the purpose of determining just compensation in this action." (Italics mine.)

Argument to the court was confusing, with the State insisting that because the defendants did not have a valid lease on the land because ownership was in another, that therefore all reference to the feed mill should have been eliminated. The court properly refused to try title in this condemnation action, but the result is not that the evidence of the value of the feed mill was admissible.

Mr. Secrest (counsel for the State), states in reference to the feed mill:

> Now, that's a rather expensive item in this case and based upon our discovery, part of their theory is that we're going to put him out of the feed lot business, and obviously you have a $250,000 feed mill floating somewhere around here. It can make a difference in how one goes about appraising the property, . . .

The attorney for the State supports his position that only the property condemned would be the subject of the award, citing *State ex rel. Wirt v. Superior Court,* 10 Wn.2d 362, 371, 116 P.2d 752 (1941), that condemnees are not entitled to recover damages from any tract except the one over which a private way of necessity was condemned.

> "Tracts held by different titles vested in different persons cannot be considered as a whole where it is claimed that one is incidentally injured by the taking of the other for a public use. This is the rule although the owner of the tract taken holds an interest in the property claimed to be damaged, and although the two tracts are used as one." 18 Am. Jur. 912, § 271.
> The damages for taking a right of way are based on ownership of land actually taken and are limited to lands held under the same title.

Reference was also made to *State v. Corvallis Sand & Gravel Co.,* 69 Wn.2d 24, 30, 416 P.2d 675 (1966), involving

a gravel pit, quoting from *Grays Harbor Boom Co. v. Lownsdale,* 54 Wash. 83, 97–98, 104 P. 267 (1909):

> Compensation is given for taking or injuriously affecting the property of the landowner. Damages must be predicated upon the property itself, or an incident of the property. When a possible use is dependent upon the acquisition of an interest in property of another, no right of compensation accrues. . . .
>
> . . .
>
> It follows that respondents cannot be compensated for the loss of a boom site, for they had no boom site to lose. To possess it they must have obtained title to, or permission to use, the property of the state.
>
> The trial court did not err in refusing to instruct the jury regarding the proximity of the state–owned portion of the gravel bar.

Later Mr. Secrest stated:

> [W]e're asking that the Court exclude any evidence which contemplates the use of another's property in conjunction with Mr. Evans' property.

That clearly includes the feed mill located on another's property.

In response to the court's question, Mr. Secrest said:

> Well, we're moving to exclude anything on destruction of the business and on separate portion of this motion . . .

referring to the feed mill, and further:

> I think at best what happens is if that feed mill is sitting on land that he doesn't own and doesn't have a lease on or anything else, at best we're talking about personalty. We're talking about a cost of moving that thing off in a situation anyway that's the best they can do. . . . In other words, the feed mill might be worth, you know, 250,000 bucks in place, but if you have to pick it up and move it and relocate it, obviously, any purchaser of property is going to deduct that in his mind, . . .

Again, the objection is inartfully stated. Nevertheless, it is clear that it was the position of the State that the value of the feed mill was not admissible because it was not compensable.

With reference to the court's inquiry about relocation expenses of the feed mill, Mr. Secrest stated:

> If that happens, you see, under the relocation assistance laws *that isn't part of this condemnation case.* It is a matter of relocation.

(Italics mine.)

Mr. McDonald (counsel for the condemnee) said:

> The people that we'll call are the people that are knowledgeable in the cattle business, and they'll put a value on this *feed mill* as it existed in the before situation.

(Italics mine.) This may have been a slip of the tongue in the use of the words "feed mill." Further, he said:

> [O]ne of the things that they will assume in connection with placing that value on it [the feedlot] is that there exists in conjunction with it a feed mill, which is functional.

In reference to the feedlot and the feed mill, he stated: .

> It is the utility of use to the subject property that permits them to say that, "So *equipped* I think the property in the before situation is worth a half a million dollars."

(Italics mine.) Later he claimed:

> And that's the utility of use which the Courts have recognized . . .

Evidently his whole approach was to get into evidence the value of the feed mill which he admitted was not part of the take.

In reference to the feed mill, he also stated, "It is a utility. It doesn't need to be the target of your take and obviously isn't, . . ."

As to the proper measure of damages, Mr. McDonald maintained:

> Now, obviously, we agree for heavens sakes, that you are going to be talking about the before and after market value. That's the rule, and it is a perfectly wise and legitimate rule and we don't have any quarrel with it.

He admitted:

> The danger in the unit rule is one of duplication that at the sums [*sic*] of the separate items can exceed the whole, and that's just a matter of instruction.

Yet, in Mr. McDonald's opening statement to the jurors with reference to the value of the feedlot, if one is going out today and reproduce the number of cattle pens (even though the cattle pens themselves were not condemned), he declared:

> [A]nd this now, understand, this isn't talking about the mill. You see, there is a mill sitting down here (indicating) that would cost you a *couple hundred thousand more dollars to replace,* but talking about their reproduction of the layout that you are talking probably about 110, $120 per unit.

(Italics mine.) He multiplied that by 5,000 head which would amount to $500,000 to $600,000.

Mr. Mellor, expert for the State, arrived at a a value of $65 a head for the Evans' feedlot, multiplied by 5,000 head capacity and came to $325,000, from which would have to be deducted the cost of curing a sewage problem. This was comparable to feedlots sold when there was a feed mill on the lot itself.

He also set the total value of the entire property at $492,250. Of course, only a fraction of it was taken. The net value of the take with improvements was $129,000.

He thus reached a total just compensation of $138,750. It is not necessary for our purposes to itemize all his computations.

In his cross–examination of Mr. Mellor, Mr. McDonald deliberately insinuates the amount of the feed mill by stating:

> Q All right, so if we are talking about X plus a $250,000 mill before under your notion or Y plus the $250,000 mill after the construction, why, X is going to equal Y in any event, isn't it?

The availability of the feed mill was relevant. Its $250,000 value was not.

Mr. McDonald again put in the amount in his question:

> If the *mill* added a couple of hundred thousand dollars to the value of this operation and in the market for the cattle yard and the after situation was *zilch* because of the freeway, then, in addition to what he was losing because of that result presently he'd be also losing the utility of the mill, wouldn't he, unless he wanted to *junk it for salvage?*

(Italics mine.) Clearly such evidence was inadmissible. There was no objection at this point as there should have been. Nevertheless, the State preserved this error which the court refused to rule on in the motion in limine.

The court asked counsel for the State, assuming that the condemnees in fact have a valid lease with the Burlington Northern:

> [I]s it your position that the respondent would be precluded from claiming damages to this feed mill as a part of the feed lot operation because it is on leased property?
>
> MR. SECREST: Let me think about that one for a minute, your Honor. I am inclined to say, yes.

The court stated with reference to the feed mill:

> Isn't it also realty and also damage to personalty, and can't the jury consider the feed mill, if nothing else, as personalty like they do the whole feed lot perhaps?
>
> MR. SECREST: I think not.
>
> THE COURT: They might consider it as personalty.
>
> MR. SECREST: I can't agree with the fact that a jury in a condemnation proceeding have an eminent domain proceeding can consider personalty.
>
> THE COURT: Of course, they can. They are going to pay him for a building that's obviously a piece of personalty.
>
> MR. SECREST: A building is a fixture, . . .

Not only is the feed mill personalty, it was not condemned, and it was not on land condemned.

The court recognized the position of the State and the intent of the defendants, stating with reference to the feed mill:

> I'm sure, is going to be, and based upon the opening statements that the feed mill is used in conjunction with the feedyard and is an *asset* of the feedyard and clearly,

according to Mr. Mellor, a valuable asset which has something to do with the value of the feedyard itself, are you saying that even though the jury might decide that the feedyard is going to be destroyed, that the cost of cure exceeds its value, that *they can't recover any damage for a feed mill* that's sitting there with no feedyard to service? Is that what you are really saying?

MR. SECREST: Yep. [*sic*]

(Italics mine.) Later the court said, referring to the feed mill:

I don't know what it is worth, but it is obviously worth a substantial amount of money, but it is not worth much without a feedyard by it I would guess.

And later:

And, if it is, certainly an element of damage is the fact that he has an asset sitting over here which is no longer useful; [This obviously refers to the feed mill.]

Direct examination by Mr. McDonald of his client, Mr. Evans:

Q What else goes into setting up a cattle yard? We've heard testimony about a mill. What would it cost—realizing that cost isn't the sole guide—but what would it cost to replace that mill that the jury saw?

A Approximately 250,000.

Mr. McDonald, in direct examination of his client, Mr. Evans, in discussing the value of the feedlot operation, mentioned a shop building which was going to be taken:

A Yes, sir.

Q All right, so that would be included in that figure? [previously given]

A Yes.

Q Alone would your mill have any utility after this occurs?

A No, sir. It is salvage.

The judge recognized this persistent, troublesome problem of the feed mill when he stated:

The damages to the feed lot are basically what are called not to the take but to the—or allocable to severance damages. . . . That is, it has an effect on the value after the freeway is in that is on the real property.

The question, of course, is whether or not the feed mill which is used in conjunction with the feedyard which is at best located upon leased property and not a great distance but some distance away. . . . And the question presented is whether or not evidence is admissible and whether the jury can take into consideration the value of the feed mill as a part of the value or enhancing the value of the feed lot.

The court stated:

I cannot allow the State to raise this issue that the feed mill is located upon property which is not owned by Burlington Northern but rather is owned by a third entity, that is, the United States Government.

That ruling was error. The natural result was then to put in the value of the feed mill which was not condemned.

Again Mr. McDonald in a leading question which was objectionable, but unfortunately not objected to, introduced the value of the feed mill. The question was to his client, Mr. Evans:

Q And obviously, you didn't. You are willing to lease property on which you build a mill? You've got you've told us personal property worth a quarter of a million dollars on that lease site, isn't that what you told us?

A Yes, sir.

Mr. Secrest, in direct examination of a Mr. McMinimee by the defendants, stated:

I'm going to object to that assumption in the question, and I don't mean to interrupt the counsel but I'd like a continuing objection on anything on leased land.

THE COURT: I understand.

On cross–examination of Mr. McMinimee, witness for the defendants:

Q O.K. Now, did you mean to express an opinion of value of the entire Evans' property . . .

A Well, the *feed mill* and his cattle feed pens is what I—not the rolling stock. Just the—I don't know. The land, the farm, the farmland, or anything like that. I'm talking about the pens that are boarded up and the feed mill.

(Italics mine.) Thus, it is clear that the value of the feed mill was included in this amount by the witness for the defendants and it was clearly the intent of defendants' counsel.

On direct examination of Mr. Golob, expert witness for the defendants, as to the basis for the testimony regarding the value, Mr. McDonald stated:

> You understand what we want you to understand particularly is that in addition to its present existence (indicating) with the north pens and the south pens and the feed mill . . .

The enhancing value of the feed mill was reflected when counsel for the defendants asked on direct examination:

> Q I see. All right. Now, let me ask you: In connection with this have you assumed for purposes of my question that this operation has a mill back here (indicating)?
> A Yes, I know that.

But this related to the method of appraising the cattle at so much per head, that is, $90 to $150, to determine the value of the feedlot.

Mr. Golob, expert witness, stated whether the feed mill was on leased land or not would make no difference, as long as "you have access to using a facility."

Cross–examination of Mr. Golob:

> Q Well, in other words, did you value the whole? You didn't intend to express an opinion of value of the entire Evans' ownership, did you?
> A I was looking at the feed lot corrals and the mill facility.

After the court ruled that the feed mill evidence was admissible, on redirect Mr. Mellor (the State's appraiser) testified as to its value. The reproduction cost new was determined to be $246,000. There was not a waiver by the State. There was a continuing objection. This was an attempted defense measure. It was done only in rebuttal.

The court further erred in refusing to give WPI 151.05, which refers to the fact that evidence has been introduced with reference to business conducted; that such evidence

should be admitted solely for the purpose of showing the use to which the property was adapted; and that the jury was not to consider the volume or extent of the business.

Mr. McDonald in his closing argument again told the jury:

> What you should do, what he should be doing, is he should be compensated for *ruining his business* and the property that they're actually taking, . . .

(Italics mine.) Actually, this was consistent with the ruling of the trial court that the defendants proceeded upon the assumption that the feedlot had a 5,000-head capacity, but the evidence indicated that at only one short period of time had it approached that capacity. It was being used for about 2,000 to 3,000 head. The court stated, in refusing to give the instruction:

> My only comment is I don't think there's any evidence in the case about business or volume of business of profits.

I think the evidence was replete with references to business and profits and how profits are computed.

In his closing argument Mr. McDonald clearly included the feed mill in the amount that the jury was to award. He stated:

> Of course it has a feed mill. The fact that it is on leased land—it was clear from the rulings of the Court— had nothing to do with the value of its utility, . . .

Then he correctly stated that the value of the feedlot is related to the accessibility to a feed mill, but he stated:

> They jumped depending on whether or not they had a mill, and they don't figure out too badly on the depreciated value from Mr. Evans' own estimate of it.

But he also stated, "The feed mill and highway are going to meet." For all purposes this mill was included in the take despite the fact that there was evidence that it could be moved for $10,000. The trial court should have ruled that all evidence and reference to the intrinsic value of the uncondemned feed mill was inadmissible. The jury should have been instructed that its value, its reproduction cost,

and depreciated present worth were not admissible, and the jury should have been instructed to disregard all that testimony.

After having carefully read the entire record, I come to an inescapable and abiding conclusion that it was the original purpose of the defendants and their very capable lawyer to include both the value of the feed mill and its enhancing operation in the award and that actually it was included. This is reversible error.

In effect, this is double recovery for the feed mill. Its nearness to the feedlot enhances the value of the feedlot. Its use for that purpose was permissible, but it was again used and reckoned into the loss because of the evidence as to its intrinsic value and its utility before the take at about $250,000, even though it was personal property on property of another, is still owned by the condemnees since it was not condemned, and it can be relocated for $10,000.

Significant is the opening colloquy where counsel with the court were discussing the cost of a waste disposal system which the defendants were confronted with prior to condemnation and which would have to be accommodated after condemnation. The defendants wished to show that the cost of a new disposal system would be considerably enhanced. Mr. McDonald, attorney for the owners, stated in reference to a disposal system:

> [T]he first plan that he comes up with . . . was over $400,000 for the first system that they came up with to solve this problem . . .
> . . . They didn't like it because quite frankly, your Honor, that cost is worth more than the property is worth and what's involved in the take, . . .

But the jury awarded $400,000.

The judgment should be reversed.

Reconsideration denied July 18, 1980.

Review granted by Supreme Court September 19, 1980.