[Sac. No. 6844. In Bank. Dec. 31, 1957.]

PACIFIC GAS AND ELECTRIC COMPANY (a Corporation), Appellant, v. JESSE HUFFORD et al., Respondents.

Robert H. Gerdes, F. H. Pearson, Charles T. Van Deusen, Carr & Kennedy and Malcolm A. MacKillop for Appellant.

Roger Arnebergh, City Attorney (Los Angeles), Gilmore Tillman, Chief Assistant City Attorney for Water and Power, O. M. Lloyd, Deputy City Attorney, E. Kendall Davis and David S. Kaplan as Amici Curiae on behalf of Appellant.

L. C. Smith for Respondents.

SCHAUER, J.—Plaintiff appeals from a judgment on a verdict assessing compensation to be paid in its action in condemnation seeking a right-of-way easement for the construction, maintenance and operation thereon of an electric transmission line, together with an easement for certain service roads, all across lands owned by defendants in Shasta County. Plaintiff also seeks, as elements of the transmission line easement, the vested right to erect suitable gates in any fences which may be constructed across such easement, and the perpetual prohibition of defendants from erecting or placing any building or other structure on the servient lands, and from locating, drilling or operating any well thereon. We have concluded that plaintiff's several contentions that prejudicial error occurred in instructing the jury and in admitting

certain evidence relating to valuation and damages are without merit, and that the judgment should be affirmed.

Defendants' entire property consists of 1,179 acres, testified to be "one of the choicest" grazing areas in Shasta County. The land is rolling, some with oak and pine trees, but mostly foothill land, except for a flat portion along a creek. It is used for grazing cattle six months of the year, from November to May.

The transmission line easement sought by plaintiff is 5,171 feet in length and 80 feet in width, and covers some 9.5 acres in the rolling hill portion of the property. The road easement is 20 feet wide and covers approximately 3.6 acres. The two easements will thus cover a total of 13.1 acres and extend over defendants' lands for one mile, less 109 feet. The transmission line will consist of one row of six steel towers, grounded, with customary wires and cross-arms, and will carry the potentially dangerous energy inherent in high voltage electricity. The towers, termed by plaintiff the "drive-through" type, will be so constructed that they will have a ground clearance of 18 feet below the bracing, so that vehicles and equipment of less than 18 feet vertical height can be moved through them. The jury found the market value of the easements to be $1,000 and severance damage to the remainder of defendants' property to be $12,500.

Plaintiff's first contention is that the value of an easement is measured by the damages resulting from its taking to the strip of land (here totaling 13.1 acres) underlying it, and that under the instructions and certain of the valuation evidence admitted by the court, the jury were "inevitably" and erroneously led to include damages to such land in their award of severance damage. Thus, according to plaintiff, double damages were to that extent awarded to defendants. This contention is without substantial merit. As hereinafter shown, if any error occurred in respect to giving the instructions or admitting the evidence complained of, it was not materially prejudicial and does not compel reversal of the judgment.

The court handed and read to the jury the following form of verdict:

"We, the jury in the above entitled case, find:

"1. That the market value of the easements taken by plaintiff is _____ dollars.

"2. That the severance damage to the remainder of defendants' property is _____ dollars."

Concerning this verdict, the jury were instructed that "if by your verdict you determine that damages will accrue to or be caused to defendants' *entire tract of land* by reason of said severance, of said easements from the remainder of the property, or by reason of the construction and installation of the power line or roads, then you will insert such amount in the second blank space in the form of verdict just read to you.

"On the other hand, if you determine that no damages will thus accrue or be caused to the property of defendants', then you will indicate such determination by writing the word 'none' in such second blank space." (Italics added.)

Reading the blank form of verdict in connection with the instructions, considered as a whole, makes it clear that the "market value of the easements" is one thing and the "severance damage to the remainder of defendants' property" is another. The jury were specifically told that "It is your duty to determine the amount of just compensation to be paid . . . to the defendants . . . for the easements taken and for the damage, if any, that may be caused to the remaining property . . . by the taking of the easements . . . [Plaintiff] is not here seeking to condemn any land but only certain easements described to you by the evidence herein. By the term easement is meant a right in land. And here the easements . . . which . . . plaintiff will acquire are two in number, and are as follows: [The transmission line and road easements were here described.]

"[T]he defendant land owner or owners will not be deprived of, but on the contrary, will retain the right to use such strips of land for any and all purposes not inconsistent with the use by the Power Company for its said purposes. . . . [I]n all cases where it can be shown as a fact that the fee, burdened with the . . . easements, is of substantial value to the . . . owners, this value is reserved to the . . . owners, and must be taken into consideration in determining the damages to be awarded for the imposition of . . . easements upon the land. . . .

"After you have determined the value of the easements sought to be condemned in this action, you must then ascertain and assess the amount of damage, if any, which accrued thereby to the property rights of the Huffords [defendants] not sought to be condemned by the plaintiff.

"That amount is called 'severance damage' and is the amount of the difference in market value of the property

rights not taken as they were on the 16th day of June, 1954 [date of filing of complaint and issuance of summons in this proceeding, see Code Civ. Proc., § 1249], and the market value of the property rights not taken after the severance of the easements therefrom. The difference between these values will be the amount of damage done by the taking of the easements . . . and the construction of the power line and roads . . .

"Thus . . . you should find, first, what was the fair market value of the easements which plaintiff seeks to condemn as of June 16, 1954, and second, whether or not the taking of those easements and the construction of the power line and roads upon them and the operation of the same, as proposed depreciate the market value of the remainder of the property of defendants . . .; and if, in your opinion the taking of such easements makes the remaining property less desirable in the minds of prospective purchasers of that class of property, then you must determine to what extent and to what amount the market value of such remaining property will be lessened . . ."

"Market value" was also defined to the jury.

Section 1248 of the Code of Civil Procedure provides that in an eminent domain proceeding the jury "must ascertain and assess: 1. The value of the property sought to be condemned, . . . 2. If the property sought to be condemned constitutes only a part of a larger parcel, the damages which will accrue to *the portion not sought to be condemned,* by reason of its severance from the portion sought to be condemned, and the construction of the improvement in the manner proposed . . ." (Italics added.)

Plaintiff contends that where, as here, only easements are taken, rather than fee title, the italicized phrase, "the portion not sought to be condemned," refers only to the land of defendants outside the 13.1 acres underlying the easements, and that by telling the jury that if they found that damages will accrue or be caused to defendants' *entire tract of land* by reason of severance of the easements, then they should assess such amount as severance damages, the court invited the alleged "double damages" which plaintiff asserts were assessed.

■ With respect to the method of valuing easements in condemnation proceedings it appears that, as stated in 17 Cal. Jur.2d 662-664, sections 95, 96 (see also cases there cited), "On principle, one who condemns less than a fee, as, for

instance, a mere easement, is not bound to pay compensation for the fee. But practical considerations have induced the courts to disregard this principle to a certain extent. Thus, in most cases of condemnation for a railroad, the distinction as to whether a fee or an easement is taken has no practical application insofar as the determination of the compensation for the rights of way acquired by the condemner is concerned, since usually there is no substantial difference in value between such an easement and the fee. Although theoretically merely an easement is taken, the fee is substantially taken in most such cases, and for all practical purposes the value of the fee is the only available and proper standard to measure the value of the easement taken. Normally, the right of way acquired, though technically an easement, will be permanent in its nature and the possibility of its abandonment by nonuser too remote and improbable to be taken into consideration; the exercise of the easement will require essentially exclusive use of the surface; and any interest that might be reserved to the owner of the fee is only nominal and of no value. . . .

██ "[However] the distinction between the taking of an easement and the taking of a fee assumes practical importance where it can be shown that the fee, after being burdened with the easement, still retains substantial value to the owner. In such a case the value reserved to the owner must be taken into consideration in determining the compensation for the easement . . .

"Such a substantial difference in value usually exists in cases where the land sought to be burdened with an easement contains mineral deposits that are reserved to the owner of the fee, who may take them out . . ." (See also Orgel on Valuation Under Eminent Domain, 2d ed., vol. 1, 452-455; 18 Am.Jur. 889; 29 C.J.S. 987-988; 38 A.L.R.2d 790-792.)

██ In cases where the fee, after being burdened with the easement created by the condemnation, will retain a substantial value, then it is held that the "condemning party is not bound to pay the full value of the land taken, but merely the decrease in market value that is due to the imposition of the public easement; in other words in awarding compensation, the value of the interest in the land remaining to the owner is to be deducted from the fair market value of the land" which will underlie the easement (18 Am.Jur. 889; see also City of Oakland v. Schenck (1925), 197 Cal. 456, 465 [241 P. 545]; 29 C.J.S. 987, n. 64.) This rule has been applied frequently in determining the amount of compensa-

tion to be paid to the owner of a strip of land over which power or other wire lines are erected. (See 124 A.L.R. 418; 49 A.L.R. 700.)

It thus appears that in a strict definitive sense plaintiff is correct in its assertion that the value as such of the easements here taken is the difference in market value of the 13.1 acres before and after the taking, and that, as requested by plaintiff, the jury should have been specifically instructed that severance damages relate only to damage to the remaining portion of defendants' land outside of the 13.1 acres covered by the easements. But we believe this contention in the light of the entire record, as heretofore and hereinafter developed, is more technical than substantial. The instructions, read together with the form of verdict, reasonably express the proposition which plaintiff asserts.

■ Plaintiff urges, however, that the subject error in definition was compounded by valuation testimony which the court refused to strike on plaintiff's motion, and, hence, must have prejudiced plaintiff by resulting in the claimed double award of damages. The record negates this contention; it shows that the total award to defendants (i.e., the "value of the easements" plus severance damage) was no greater by reason of the errors complained of than it would have been had they not occurred, and that consequently no prejudice to plaintiff is shown.

■ The valuation witness, Bryant, whose testimony plaintiff attacks, stated that the "value of the easement within the tower line and within the road" was $500; that "the damage to the remainder of the property by reason of the taking" amounted to $15,000; that "I figured the five hundred dollars would actually [be] damage to the ground underneath the easement right of way" and that "The fifteen thousand was damage to the ranch as a whole and the resale value in the eyes of a prospective purchaser . . . Including *additional damage* to the thirteen point one [acres] . . . Some of the fifteen thousand dollars includes *additional damage* to the thirteen point one acres." (Italics added.) Thus, although Bryant further testified that he could not tell how much of the fifteen thousand dollars severance damage included additional damage to the 13.1 acres, over and above the $500 to which he had testified, it appears that, contrary to plaintiff's contention, he did not actually include double damages to the 13.1 acres in his total damage figure of $15,500.

This conclusion finds additional support in Bryant's further testimony that the reasonable market value of the entire 1179

acres of defendants' ranch prior to taking of the easements was $115,000, and that the market value of the entire ranch after being impressed with the easements would be $99,500. The difference in his "before and after" valuations of the entire ranch thus exactly equals the $15,500 total damage figure to which he testified, and, as stated, clearly shows that no double damages were included in his computations.

In this connection it is to be noted that in California severance damages "may be shown by proving the market value of the remainder before and after the taking and leaving the computation of the difference to the jury, or by competent evidence of severance damages in a lump sum." (*People* v. *Ricciardi* (1943), 23 Cal.2d 390, 401 [9] [144 P.2d 799]; *People* v. *Loop* (1954), 127 Cal.App.2d 786, 799 [7] [274 P.2d 885].) Furthermore, plaintiff itself has suggested in reliance upon Orgel on Valuation Under Eminent Domain, 2d ed., vol. 1, p. 238 (see also p. 454), that "a rule which sets damages as the value of the part taken plus damage to the remainder is not as desirable as a rule of damages limited to the difference in value of the whole before and after the taking." (See also 124 A.L.R. 407; 49 A.L.R. 697.) Inasmuch as the witness used both methods, and correlated his figures to reach the same ultimate total of $15,500, it is manifest that no prejudice to plaintiff has resulted. It may also be pointed out that defendants' other two valuation witnesses likewise testified as to "before and after" market values of the entire Hufford ranch, as well as to the value of the easements and the amount of severance damage to "the remainder of the property," and likewise correlated their figures so that the total detriment which in their opinions would be suffered by defendants was the same by either method of computation: in the opinion of one witness a total of $16,500 and in that of the other $18,900. In view of matters above recited, and of the further fact that the jury's total award was only $13,500, it appears ineluctable that plaintiff's claim that double damages were assessed against it is not sustained and, hence, any technical error in the instruction complained of furnishes no ground for reversal of the judgment.

Plaintiff next contends that error prejudicial to it resulted when the trial court admitted, and refused to strike, certain testimony relating to valuation and damages, which plaintiff argues was based on speculative and remote elements. Complaint is first made of the testimony of the witness

Bryant, a real estate broker in Shasta County, who sells ranches "as a business." On direct examination Bryant testified on behalf of defendants that their property is best adapted for agricultural and mineral purposes, though presently being used for grazing land, i.e., as a stock ranch. On cross-examination he stated that grazing and farming were the highest and best uses, with agriculture a "slightly less advantageous use than grazing." As stated hereinabove, he further testified that in his opinion the reasonable market value of the entire ranch before being impressed with the easements sought by plaintiff, "having in mind all of the uses and purposes to which it is reasonably adapted, having in mind if the property was offered in the open market for sale for cash, allowing a reasonable time within which to find a purchaser," was $115,000, and after the easements were taken such value would be $99,500; and that damage to the remainder of the property by reason of the taking was $15,000. During cross-examination he was asked questions and gave answers as follows:

"Q. Well, isn't it true, Mr. Bryant, if you lop off its mineral possibilities, it wouldn't depreciate the value of the property in your opinion nearly as much as if you lopped off its grazing possibilities? . . . A. In the eyes of some purchasers, not all of them . . .

"Q. Its mineral possibilities don't increase its market value appreciably, do they? A. Oh yes, oh yes.

"Q. They do? A. By that I mean you have a mineral restriction on a ranch, no matter where it is located and get it [the proposed sale the broker is negotiating] up to closing and the preliminary title shows a mineral reservation, you will always have trouble . . .

"Q. If the owner were to reserve the mineral rights, . . . How would that alter your one hundred fifteen thousand dollar figure? A. I didn't take that into consideration. I took it as a whole, the fact that they were all there."

In response to further questioning the witness stated that he had made no geological tests on defendants' property; that to his knowledge it had never been drilled for gas or oil nor had oil or commercial gas been discovered in Shasta County; that "I was only looking at a ranch from what a prospective purchaser would look at it"; that he did not know of anyone interested in the property exclusively for its mineral value nor did he know whether the property could be "profitably used for its mineral value"; that he was considering the gas

and oil possibilities "Only as a portion of the total appraisal . . . [A]nything in Northern California now has a mineral potential . . . and lots of buyers come in and ask us about the mineral potential up here . . . Oh, and we know they have drilled out there [on neighboring property]."

The effect of plaintiff's argument in relation to the witness' references to mineral rights in defendants' land is that because such land was not shown to be actually, or with reasonable certainty, potentially oil or gas producing in commercial quantities, the partial deprivation or impairment of the owners' mineral rights in Parcel 1 (transmission line easement) would not affect, nor could the possible existence of value through such rights in the entire holdings of defendants even be considered in estimating, the value of the whole, the value of the interest taken, or of that remaining. The untenability of such contention is self-evident. The witness' testimony is clear—and even were it not in the record it would seem to be a matter of common knowledge—that competent people acting freely with time to investigate, simply do not purchase ranch land anywhere in California without giving consideration to the state of the title, including ascertainment of the material fact as to whether the title to be conveyed does or does not include all mineral deposits in the land together with the unobstructed right to locate, develop and operate them, including, if and as appropriate and wherever most convenient, the erection of "structures" such as buildings, reservoirs, mineshafts, well-drilling rigs, water wells, oil wells, mines, etc.

Furthermore, at this stage of the litigation, plaintiff is in no position to urge that the possibility of mineral exploitation of some sort is not existing and substantial for it expressly pleads "That it is . . . necessary that no building or other structure shall hereafter be erected or placed upon, and that no well shall be located, drilled or operated within said Parcel 1 by defendants, their successors or assigns, and that said defendants, their successors or assigns be prohibited from so doing." The noun "well" as defined in Webster's New International Dictionary, 2d ed., Unabridged, includes the following meanings: "1. An issue of water from the earth; . . . 2. Specif., a mineral spring . . . 3. A pit or hole sunk into the earth to . . . reach a supply of water . . . 4. A shaft or hole sunk to obtain oil, brine, gas, etc. . . . 16. . . . A shaft or excavation in the earth, in mining, from which run branches . . ." Manifestly, plaintiff's pleading seeks to permanently debar defendants from locating or operating on

Parcel 1 a well for any of the uses—whether for water, mineral, oil, mining—comprehended by the definitions quoted. If it is "*necessary*," as plaintiff alleges, "that said defendants, their successors or assigns be prohibited from" locating, drilling or operating any well "within said Parcel 1," then it would seem to follow (and plaintiff would have the court believe) that without such prohibition the persons enjoined would, in the exercise of their rights of ownership, perform the prohibited acts. It will be remembered also that, for the benefit of plaintiff, the jury were instructed that "the defendant land owner or owners will not be deprived of, but on the contrary, will retain the right to use such strips of land [subjected to the easements] for any and all purposes not inconsistent with the use by the Power Company for its said purposes . . . [I]n all cases where it can be shown as a fact that the fee, burdened with the . . . easements, is of substantial value to the . . . owners, this value is reserved to the . . . owners, and must be taken into consideration in determining the damages to be awarded for the imposition of . . . easements upon the land." Obviously, the impairments of the rights of defendants in the respects as to which plaintiff seeks permanent prohibition against defendants, together with the value thereof and the effect on the remainder, was a proper subject of testimony. We are satisfied that the court did not err either in admitting or in refusing to strike out the subject testimony.

 With respect to irrigated farming, Bryant further testified, on cross-examination, that "I don't know exactly" what water rights defendants' ranch has and "was thinking of a well . . . when I mentioned irrigated farming . . . I know that water is not too far down out there"; he thought that drilling would "get a supply of water"; he could not say how much of the property could be irrigated because that would depend on "how far you have got to go for water and what your pumping cost would be . . . [and] upon the type of irrigation used"; he did not know whether or not it would be profitable to irrigate the ranch or whether there would ever be a purchaser interested in it exclusively for its irrigated farm possibilities, but did know that a purchaser "would take into consideration all of the attributes and if there was a potential sprinkling or irrigation system there, he would . . . have it in the back of his mind. . . . He would weigh all of the potentials of the ranch . . . [T]he sprinkler systems are getting better all the time, economically, to use.

A few years ago there was no such thing as a sprinkler system and right now there wouldn't be too much of that that you could sprinkle, but it is not out of the realm of possibility, ten years, the land becoming more valuable, more near to market and sprinkler systems becoming commoner, cheaper to operate, a good part of that could be sprinkled." It is clear that plaintiff by seeking to expressly prohibit defendants from *locating*, drilling or *operating any well*, or placing any building or *other "structure"* on Parcel 1, precluded itself from objecting to competent evidence relative to possible irrigation and the use of sprinkler systems.

With respect to dry farming or grain farming, Bryant stated that because of the "acreage limitations on wheat . . . As things stand now, agriculture is a slightly less advantageous use" of the property than grazing "Unless the quotas were changed"; that "In assessing its possibilities for grain land, it is very important to know what quota you would get" and the witness had no way of knowing, as "you have no idea what quota a new operation would get."

All of the four mentioned possible uses of grazing, dry farming, irrigated farming, and mineral, entered "To a certain extent" in Bryant's $115,000 valuation of defendants' property, but he testified he could not state how much such valuation would be decreased by disregarding the farming or mineral uses, that in arriving at his estimates of value he "took it as a whole, the fact that they [all rights of ownership for grazing, dry farming, irrigated farming and mineral development] were all there."

Concerning severance damages, Bryant testified that "Lots of" cattle will not gain weight for quite a while under a power line because the noise ("buzzing") disturbs them and they won't bed down under it, "Every cow, just like a human being, every cow has a personality," and how long it takes them to become used to a power line "depends on where they come from and the personality"; that a prospective buyer of the ranch might wish to build a house under one of the power lines and would not be able to, and that the resale of one piece of property he knew was hurt because a house was under a power line and television was anticipated; and that irrigation would be hindered because of the danger that sprinklers might come in contact with the power line, "I would hate to have my son changing sprinklers with a thirty or forty foot pipe under a power line. . . . That land where

these towers are, you couldn't have the normal check irrigation. Sprinklers would be possible, sprinkler system, you buy one line of pipe, you move them 20 to 30 feet. It would depend on how far down you want watering to go, every so many hours; and so you kind of pick a piece of pipe and carry it over your shoulder. That's what I referred to by that, you might hit a power line there." The witness also considered the possibility that plaintiff's crews "might not clean up" in view of the fact that a few days previously "every branch or tree they had cut down for the survey, which was quite a while ago, was still lying on the ground. Not one of them had been cleaned up." The above elements were included in a list of some 13 items which, in addition to others not listed, Bryant testified he had considered in reaching his estimate of $15,000 total severance damages; he further stated that he could not revise his estimate if some of such elements were excluded, as "I took the whole thing as a whole, studied it. Took those disadvantages and put a figure on them, maybe some are weighted heavier than others. I don't know exactly."

Plaintiff in support of its contention that the "items of damage and the uses set forth above are remote and speculative," and that its motions to strike Bryant's testimony on that ground should have been granted, relies upon *People* v. *Ocean Shore Railroad* (1948), 32 Cal.2d 406, 425-426 [196 P.2d 570, 6 A.L.R.2d 1179]. It was there stated that "Under section 1249 of the Code of Civil Procedure the measure of compensation for property taken is its market value, which is to be determined by a consideration of all the uses to which it is adapted and for which it is available. [Citations.] In this connection, the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not as the measure of value, but to the extent that the prospect of such use affects the market value of the land; however, elements affecting value which, while possible, are not reasonably probable, should be excluded. [Citations.] Accordingly, where it is not shown that a suggested use would be profitable, or where it appears that the operations cannot be carried on except at a loss, the prospect of use for such a purpose is not a proper element of value. [Citations.]"

However, in the cited case the point at issue was whether plaintiff's valuation witnesses disregarded the value of defendant's property for its highest and best use, which defendant claimed was for railroad purposes. It was held that in view

of positive testimony that neither defendant nor its prede-cessor had been able to operate the railroad on the property profitably although they attempted to do so for about 15 years, that the tracks had been taken up, no trains had been operated since 1920, and parts of the roadbed had been washed out and eroded, and that the railroad would not be eco-nomically feasible, "it cannot be said as a matter of law that the evidence of these witnesses was incompetent because they treated the property as without value for railroad purposes." (P. 426 of 32 Cal.2d.)

By contrast, Bryant's testimony in the present case referred only to elements which, in his experience as a real estate broker dealing in ranch and agricultural properties in Shasta County, prospective purchasers of defendants' prop-erty would take into consideration—elements which he testi-fied had a bearing on the market value of defendants' prop-erty both before and after being impressed with the easements sought by plaintiff. He made it clear that he was not basing his estimate of value on any assumption as a fact of that which he recognized was a mere possibility; rather, he simply mentioned the possibility as something which a prospective buyer would consider. He repeatedly mentioned that he had not assigned separate sums for each of the elements of market value and of severance damage which he had considered, but that they had entered as a whole in the final amounts to which he testified. This approach was correct. (*Long Beach City H. S. Dist.* v. *Stewart* (1947), 30 Cal.2d 763, 771 [185 P.2d 585, 173 A.L.R. 249] ; *People* v. *La Macchia* (1953), 41 Cal.2d 738, 751 [21] [264 P.2d 15].) Manifestly, the fact that the witness took cognizance of each of the several servi-tudes (hereinabove mentioned) which plaintiff sued to impose on defendants' property cannot be complained of by plaintiff. If plaintiff thought so much of such potential uses of defend-ants' land as to sue specifically to permanently enjoin its use, in so far as Parcel 1 is concerned, for buildings or structures of any kind, or for the location or drilling or operation of any well—whether for water, oil, gas, or other mineral sub-stances—then plaintiff cannot well gainsay defendants' right to have those potentialities considered in assessing their dam-ages. As declared in *City of Los Angeles* v. *Hughes* (1927), 202 Cal. 731, 733 [262 P. 737], "the value of the property at the time of the taking is to be determined not only by the uses to which it is then put, but also by the uses of which it is reasonably susceptible." (See also *Long Beach*

*City H. S. Dist.* v. *Stewart* (1947), *supra,* 30 Cal.2d 763, 768-769; *People* v. *La Macchia* (1953), *supra,* 41 Cal.2d 738, 751; *People* v. *Jones* (1945), 67 Cal.App.2d 531, 537 [155 P.2d 71]; 17 Cal.Jur.2d 646.) Further, the witness' testimony as to severance damages was directly related to the purposes for which he stated the property was then adapted. No ground for reversal is shown to exist in Bryant's testimony.

 Plaintiff next complains of the testimony of the witness Prawl, who lived about two miles from defendants' property. Over objection by plaintiff, Prawl was permitted to testify that a well was completed on his property by Humble Oil Company in August, 1953, some 17 months prior to the trial herein; that gas came out at high pressure and that to stop the gas the hole was closed by cement. This was the only "gas hole" he had ever heard of in Shasta County and no commercial use had ever been made of it. As commented by the trial judge in admitting Prawl's testimony, "it is quite normal, I think, to describe circumstances and surroundings of the property in question as a basis of valuation." Moreover, no witness assigned any particular value to defendants' property for "mineral uses," and in the minds of the jury the fact that no commercial use had been made of the well on Prawl's property might well have been considered as indicating that defendants' property had no valuable potential in this respect, rather than the contrary. No prejudice to plaintiff appears from this item.

 Plaintiff also contends that the valuation testimony of the witness Hunt was based on speculative considerations and should have been excluded. Hunt, a farmer and stock raiser whose land, on which he has resided since birth and which his father before him had owned and farmed, adjoins that of defendants, also operates other ranching properties in Northern California. He has "personally been engaged in ranching and stock raising" for some 40 years, and has been familiar with defendants' property for the same period of time. He testified that the best uses of the property were stock raising first, "farming next and probably mineral." Hunt also testified that the market value of defendants' property before the taking of the easements by plaintiff was $112,000, and after the taking would be $95,500. Plaintiff again argues that inasmuch as "mineral" was one of the possible potential uses considered by Hunt, his valuations must have been based in part thereon, were thus speculative and remote as a matter of law, and should not have been admitted

in evidence. As has been hereinabove shown, the subject of potential mineral value and development was impliedly introduced into the case by plaintiff's pleading and requested instructions. It cannot complain that defendants' witnesses took heed of the subject. Furthermore, Hunt testified that the "highest and best" use of the ranch was for stock raising, "operating it just as Mr. Hufford has been doing the past great many years," and that he placed mineral uses below stock raising and farming. Thus it appears that in any event the witness' evaluation was based on present proven uses. We are satisfied that his reference to mineral uses did not render his testimony incompetent and that the weight to be accorded his opinion was properly left to the jury.

 Plaintiff further urges that Hunt was not qualified to give an opinion as to the value of defendants' property after being impressed with the easements, or as to severance damages. He testified that he had lived with a power line across his own property for 33 years, and had personal knowledge of what effect high tension power lines have upon property. He had also made a sale of property across which there was a power line. After questioning by counsel and the trial court as to his familiarity with and investigation of other sales of properties in the area with power lines on them, the court, over objection by plaintiff, permitted the witness to give his opinion as to both market value and severance damages after imposition of the easements. Without here detailing plaintiff's arguments with respect to this evidence, it is sufficient to state that no error is shown. As declared in *Los Angeles City High School Dist.* v. *Rodriguez* (1955), 135 Cal.App.2d 760, 768 [8] [287 P.2d 871] (see also cases there cited), "Owners of land in the vicinity, familiar with the property in question are competent witnesses [citations] . . . [and] frequently have a better idea of land values than strangers who are engaged in the business of selling land [citations]." (See also 18 Am.Jur. 999.) Further, "It is for the trial court to determine, in the exercise of a sound discretion, the competency and qualification of an expert witness to give his opinion in evidence [citation], and its ruling will not be disturbed upon appeal unless a manifest abuse of that discretion is shown." (*Beresford* v. *Pacific Gas & Elec. Co.* (1955), 45 Cal.2d 738, 749 [13] [290 P.2d 498]; *Lynch* v. *Birdwell* (1955), 44 Cal.2d 839, 849 [13] [285 P.2d 919]; *Huffman* v. *Lindquist* (1951), 37 Cal.2d 465, 476 [234 P.2d 34, 29 A.L.R.2d 485]; see also *City of Los Angeles* v.

*Frew* (1956), 139 Cal.App.2d 859, 868-869 [294 P.2d 1073].) No such abuse appears here. The same may be said with respect to the valuation testimony of the witness Abbott, another neighboring stock rancher, of whose testimony plaintiff complains on grounds similar to those on which it attacks the testimony of Hunt.

 Finally, plaintiff complains that the trial court erred in instructing the jury as follows: "You are not confined to the value of the property in its condition on the 16th day of June, 1954, or to a consideration of its use only at the time of taking; but you may also consider the reasonably substantial possibility of its being capable of being put to a more profitable use had it not been taken, but in so doing, you are not to consider remote, speculative, imaginary, uncertain or conjectural possibilities." Plaintiff's contentions on this point appear to be but a reiteration of its attacks on the valuation testimony set forth hereinabove, which, as already developed, are without substantial merit.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., and Spence, J., concurred.

McCOMB, J.—I dissent, for the reasons expressed by Mr. Presiding Justice Van Dyke in the opinion prepared by him for the District Court of Appeal (Cal.App.), 311 P.2d 936.

Appellant's petition for a rehearing was denied January 28, 1958. McComb, J., was of the opinion that the petition should be granted.