[No. D003936. Fourth Dist., Div. One. Nov. 17, 1988.]

SAN DIEGO GAS & ELECTRIC COMPANY, Plaintiff and Appellant, v.
DONALD L. DALEY et al., Defendants and Respondents.

COUNSEL

C. Larry Davis, Asaro & Keagy, Roscoe D. Keagy, Richard R. Freeland and Arnold Neves, Jr., for Plaintiff and Appellant.

Procopio, Cory, Hargreaves & Savitch, Alec L. Cory, James G. Sandler and David A. Niddrie for Defendants and Respondents.

OPINION

STANIFORTH, J.*—San Diego Gas & Electric Company (SDG&E) appeals a judgment entered in a condemnation action instituted by SDG&E

---

* Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

against Donald L. Daley and Lawrence A. Daley (Daley), which sought to acquire a 200-foot wide power line easement across the Daley property, commonly known as Rancho Jamul. The action was tried by a jury whose verdict awarded Daley $190,000 for the property condemned and severance damage to the remaining property in the sum of $1,035,000. Interest in the amount of $486,066.68 was assessed on the principal amounts determined by the jury. Further, litigation expenses in the sum of $365,794.53 were awarded to Daley.

Daley seeks attorneys fees and litigation expenses on appeal as well as affirmance of the judgment below. (Code Civ.Proc.,[1] § 1250.410, subd. (b).) Daley does not contest SDG&E's right to condemn the property. At trial he questioned only the utility company's assessment of "just compensation" which must be paid to him under the eminent domain statutes. (§§ 1263.310 et seq.) SDG&E contends (1) the trial court over its objection improperly allowed Daley's experts to testify that because there was a "controversy" over whether electromagnetic fields may cause biological injury to humans and animals, they would discourage placement of residences within an area parallel to and as wide as 900 to 1000 feet from the edge of the easement; (2) the court erroneously prohibited it from presenting rebuttal testimony to show that a knowledgeable buyer in the marketplace would not be concerned with the purported controversy and, therefore, no diminution in value would result from such cause; (3) these errors prejudicially affected the jury's determination of just compensation causing reversible error; and (4) the court erred in finding SDG&E's final offer made pursuant to section 1250.410, subdivision (a) was unreasonable resulting in assessment of litigation expenses in the amount of $365,794.53. SDG&E seeks reversal including litigation expenses and remand for new trial.

## PROCEDURAL BACKGROUND

On March 29, 1982, SDG&E filed its complaint in eminent domain to acquire a 200-foot wide power line easement across the Daley property. At the time of filing the complaint an order for prejudgment possession was issued by the court requiring SDG&E to deposit $110,000, the probable amount of compensation to be awarded. This amount was later withdrawn by Daley pursuant to stipulation of the parties. Daley answered the complaint and later filed his list of expert witnesses identifying his evaluation witnesses as Robert H. Williams, an expert in land planning, and Joseph G. Johns. Daley's statement of evaluation stated Daley was seeking compensation in the amount of $1,450,000 for the taking of the subject property.

At the same time, SDG&E filed and served its designation of expert witnesses, including evaluation experts Lee C. Johnson and Joseph A.

---

[1] All statutory reference are to the Code of Civil Procedure unless otherwise specified.

Gallagher as well as three experts whose testimony would relate to the existence of biological effects, if any, caused by overhead transmission lines.

On April 10, 1985, the parties exchanged their statutory settlement offers. Daley offered to settle the litigation for $750,000. SDG&E offered to settle the litigation for $330,000. Thereafter, SDG&E filed a motion *in limine* to exclude anticipated testimony concerning alleged hazardous biological effects resulting from the electromagnetic fields surrounding the power line. The motion also sought to exclude certain testimony by Daley's experts which relied upon as a foundation information received from other experts whose identities were not disclosed before trial. The trial court denied the motion, ruling the Daley experts could testify to the effect on value, if any, of public fear of overhead transmission lines. The court declared the reasonableness of the alleged buyer fear was irrelevant and thus ruled there would be no testimony as to specific fears or as to the reasonableness of such fears. The jury's verdict (by a vote of 9 to 3) declared the fair market value of the easements taken as of March 29, 1983, was $190,000, and further, the severance damage of the remainder of the property as of that date was $1,035,000. SDG&E filed a motion for a new trial and Daley filed a motion for recovery of litigation expenses pursuant to section 1250.410, subdivision (b). The court denied SDG&E's motion for a new trial. Judgment was entered November 14, 1985. On December 4, 1985, the court awarded trial litigation expenses in the sum of $365,794.53.

In its determination to allow testimony concerning the effect of buyer fear and property values without proof of the actual scientific basis for the fear, the court suggested that the appellate court, if the trial court was correct, allow the award to stand; however, if the trial court was in error then that portion of the award (increased severance damages due to buyer "fear") could be stricken so there would not have to be a retrial. The court suggested in implementing this procedure: "Maybe we could have some special findings in that regard so that we could tailor all of these issues for appellate review, depending upon the pleasures of the parties, of course, so that all the appellate court would have to do is make rulings as to whether I was right or wrong. Then it would—the award would automatically be adjusted in accordance with those views."

Daley agreed to this procedure for special verdicts but SDG&E rejected the use of special verdict forms to determine the extent to which the jury awarded severance damages based upon buyer fear of electromagnetic fields.

### The Trial

SDG&E's first witness, Terry Mack Winter described how electricity is transmitted: to transmit 500,000 volts, the system would actually have to

carry between 525,000 and 550,000 volts because of resistance or loss of energy. SDG&E introduced as part of Winter's testimony the environmental impact report (EIR) which was commissioned for the project in findings of the California Public Utilities Commission (CPUC). Winter testified the EIR identified several factors among others having a major impact upon the environment: (1) the noise, (2) the unsightliness of the project's massive steel towers, and (3) the electromagnetic fields generated by the flow of electrical energy. With regard to this last factor, Winter testified that the studies conducted were "inconclusive." Several studies had suggested that electrical fields were hazardous to humans and animals and that there was at least a controversy within the scientific community on this issue. One of the mitigation requirements of the EIR was that SDG&E continue to review the literature as it becomes available on the subject.

Lawrence Daley testified the project has ruined the beauty of Rancho Jamul. Next called was Robert Walters, a civil engineer, for his opinion as to the highest and best use of the Daley property. Walters concluded the property was unusually good for residential development. Walters also testified concerning the effect of the SDG&E project on the development of Rancho Jamul. He testified the presence of the power line caused several problems for potential developers, raising the cost of development. These included visual impairment, the noise of the electromagnetic emanations, construction of easement crossings, additional landscaping to hide the easement, unusual lot shapes, the adding of precautions to ensure safety and security of residences adjacent to the easement, and finally, unusual street locations and drainage configurations. Walters testified he, as a civil engineer on another project involving 500,000 volt transmission lines, had included a setback of the power lines of 1,000 feet in his development plans. These setbacks were to mitigate both the noise and potential adverse effects of electromagnetic radiation. Walters testified he had never done this on any other project because he would not have been aware of "any data to back up such a requirement." Now he had become aware of the controversy surrounding electromagnetic radiation. He testified in the future he would call the potential problems to the attention of developers and "let [them] make the decision as to how [they want] to proceed. . . ."

SDG&E sought to strike Walters's testimony because setbacks had not been routinely used by developers. The trial court denied the motion saying "it goes to the weight rather than the admissibility. [¶] This witness is testifying that based upon most recent information that he has received, that he now feels that he has a duty to make these disclosures to developers, . . ."

SDG&E's attorney requested he should be allowed to rebut Walters's testimony by producing evidence that electromagnetic fields do not pose

any significant health hazard. The court ruled: "[If] the plaintiff establishes that there is a controversy as to the existence or none [*sic*] existence of a magnetic field under high power lines, and that that conflicting opinion or controversy is known by people who develop property, they are aware of it as this apparent witness is aware of it, and that it plays some part in the development of property and has a negative impact so far as developers are concerned, then that's as far as we are going to go. And we are not going to open a Pandora's box and have a mini trial on whether or not he's right and who is wrong with the environmental impact."

The trial court did not preclude the introduction of *evidence to prove the controversy does not have any effect on the real estate market,* stating: "You are doing that very thing by pointing out to this witness that in three of the current developments that he's working on the developers are building right up to the easement line without concern of the magnetic field.

".    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"You can [also] bring all of the evidence that you want before the court that there are . . . major developers out there in San Diego County that are building under power lines and they are building right to the easement and they are not concerned about the environmental impact or the magnetic fields."

Joseph G. Johns was next offered as an expert witness by Daley. He was of the opinion the highest and best use of Rancho Jamul would be a master planned community. Johns pointed to the visual component as an adverse effect on future development. He stated the power lines and towers could be seen from approximately 4,049 acres of the ranch. With regard to audible impact Johns stated for a substantial portion of the year the static noise generated by electricity exceeded the level permissible by county ordinance for residential daytime noise (50 decibels) at a distance of 75 feet from the edge of the power line easement. During the same period the sound of power lines exceeded the level set by county ordinance for residential night-time noise of 45 decibels at a distance of 735 feet from the edge of the easement. Mr. Johns noted that on the same days, those power lines were clearly audible (35 to 41 decibels) at a distance of 2,070 feet beyond the right-of-way.

Johns further testified the flow of electricity through the project power lines created an electromagnetic field which extended beyond the edge of the easement; the EIR for the project noted there was a controversy regarding the possible health hazards associated with this force field. Johns was of the opinion it was a factor that should be considered in advising future developers of the best and most appropriate use of the property. Johns

calculated the distance from the power line one would have to travel to avoid exposure to electromagnetic radiation in quantities greater than in everyday life ranged from 450 feet to 800 feet depending upon the height of the power line. As an environmental planner Johns would recommend that no residential structure be built within 250 feet of the power line and would strongly discourage development within 800 feet. Johns concluded that by reason of the electromagnetic presence, "[i]t has taken an area which would have in the before condition been considered perhaps one of the very first places to develop, and it has made it one of the last places that you would want to develop, if at all."

Daley's final witness was Robert W. Williams, a real estate appraiser. He evaluated Rancho Jamul in its "before condition" as well as its "after condition." He used a market approach to conclude the highest and best use was a planned community possibly along the lines of Rancho Bernardo. In the market approach Williams then appraised Rancho Jamul in the before condition and based upon a comparison of the Daley property to 12 other recently purchased parcels with adjustments for Rancho Jamul's size, location, etc., Williams arrived at a before value of $30,850,000. On the issue of severance damage, Mr. Williams identified the characteristics of the project adjacent to the easement to become less desirable and less marketable. The characteristics were the same as outlined by previous witnesses (Walters and Johns). He said the *visual* and *audible* aspects of the power line had the greatest impact on market value. Williams did not assign a particular dollar value to each of the factors discussed because he could find no comparable sales of property with 500,000 volt power lines. Instead he compared the "absorption rate" of the property near the power lines with the rest of Rancho Jamul. He concluded that the property immediately adjacent to the power line had become in his opinion the worst land on the property for development. It would take longer to sell. The resulting delay in development was quantified in monetary terms. Williams was of the opinion the factors discussed would cause a five- to ten-year delay in the development of the property within 660 feet of the edge of the right-of-way, and a three- to five-year delay in the development of the property within 1,320 feet of the easement. Williams determined that the diminution in value of the Daley property as a result of the project totalled $1,266,000 or about 4 percent of the before value of Rancho Jamul.

In rebuttal SDG&E called Terry Snow, an electrical engineer, to testify on the just compensation issue. He did not test the power lines running across the property. Paul A. Manganelli, a land use planner, also testified. He agreed with the Daley experts that the highest and best use of Rancho Jamul would be a planned residential community. Finally SDG&E called its appraiser Lee C. Johnson to testify as to the before and after value of Rancho Jamul. Johnson concluded the Daley property was worth $28.7

million. Johnson assigned a 20 percent damage figure to the land within a 600-foot radius of each tower.

### The Claims of Error

SDG&E concedes that no judgment should be set aside or new trial granted unless the error complained of has resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13.) A miscarriage of justice occurs when this court is of the opinion that a result more favorable to the appealing party would have been reached in the absence of the alleged errors. (*Bedolla v. Logan & Frazer* (1975) 52 Cal.App.3d 118, 137 [125 Cal.Rptr. 59].) SDG&E asserts prejudice occurred in allowing testimony (over its objection) that buyer fear of electromagnetic fields emanating from the project would decrease the value of the Daley property. SDG&E argues the error occurred in allowing that testimony when there was a conceded controversy concerning the existence of adverse biological hazards from electromagnetic fields. SDG&E further asserts the trial court erred in ruling buyer fear as it relates to severance damage would be compensable irrespective of whether such fear was reasonable, and also erred in ruling SDG&E was foreclosed from offering testimony on the issue of whether such fear was reasonable or unreasonable and speculative. In the trial court's opinion it was common knowledge there were some biological problems associated with high voltage transmission lines. SDG&E further complains it was erroneously foreclosed from attempting to cross-examine Daley's experts as to the basis of their opinions concerning the asserted controversy and further it was improperly precluded from using experts to show the jury there was no reason to deduct any value because of some speculative assertion that electromagnetic fields caused biological hazards to humans or animals.

### DISCUSSION

### I

The Constitution demands the condemnee receive just compensation for the taking of his property. (Cal. Const., art. I, § 19.) The term "just compensation" includes the fair market value of the property taken (§ 1263.310) and the injury if any to the remainder of the condemnee's property. (§ 1263.410, subd. (a).) ■ To determine just compensation there must be a determination of the highest and best use to which the property being condemned can be put. Thus the fair market value is fixed at its most advantageous and potentially profitable use. (*Redevelopment Agency* v. *Contra Costa Theatre, Inc.* (1982) 135 Cal.App.3d 73, 83 [185 Cal.Rptr. 159].) Compensation for any injury to the remainder is determined by assessing the damage caused by (1) the severance of the remainder of the property

taken and (2) the construction and use of the project for which the property taken was condemned. (§ 1263.420.) These collectively are severance damages.

■ In determining severance damage, the jury must assume "the most serious damage" which will be caused to the remainder by the taking of the easement and construction of the property. (*L.A. County Flood Control Dist.* v. *Jan* (1957) 154 Cal.App.2d 389, 393 [316 P.2d 25] disapproved on another point in *People* v. *Chevalier* (1959) 52 Cal.2d 299, 305-307 [340 P.2d 598].) The value of the remainder after the condemnation has occurred is referred to as the "after" value of the property. The diminution in fair market value is determined by comparing the before and after values. This is the amount of the severance damage. (*County of Santa Clara* v. *Curtner* (1966) 245 Cal.App.2d 730, 743 [54 Cal.Rptr. 257].)

■ The condemnee is permitted only one opportunity to seek compensation for all foreseeable damage to his property resulting from the condemnation and construction of the project as well as any improvements that may be constructed. (*City of Salinas* v. *Homer* (1980) 106 Cal.App.3d 307, 313-314 [165 Cal.Rptr. 65], quoting *Ellena* v. *State of Calif.* (1977) 69 Cal.App.3d 245, 254 [138 Cal.Rptr. 110].) Therefore, severance damages are not limited to specific direct damages but can be based on any indirect factors that cause a decline in the market value of the property. (*Pierpoint Inn, Inc.* v. *State of California* (1969) 70 Cal.2d 282, 295 [74 Cal.Rptr. 521, 449 P.2d 737].)

■ California decisions have indicated the following are compensable as direct damages under section 1263.410: (1) impairment of view, (2) restriction of access, (3) increased noise, (4) invasion of privacy, (5) unsightliness of the project, (6) lack of maintenance of the easement and (7) nuisances in general such as trespassers and safety risks. (70 Cal.2d at p. 295; *Sacramento, etc. Drainage Dist.* ex rel. *State Reclamation Bd.* v. *Reed* (1963) 215 Cal.App.2d 60, 71 [29 Cal.Rptr. 847]; see also *Pacific Gas & Elec. Co.* v. *Hufford* (1957) 49 Cal.2d 545, 555, 561 [319 P.2d 1033].) Several courts have recognized that the condemnee should be compensated for any characteristic of the project which causes "an adverse impact on the fair market value of the remainder." (*City of Salinas* v. *Homer, supra,* 106 Cal.App.3d at p. 312; *Ventura County Flood Control Dist.* v. *Security First Nat. Bank* (1971) 15 Cal.App.3d 996, 1000-1002 [93 Cal.Rptr. 653].)

Pursuant to the foregoing rules, several experts testified as to the highest and best use of the Daley property and considered the various factors which would depreciate the remainder of the property in the after condition. These various depreciating factors were not segregated out and no particular value was assigned to any of them. The experts in effect testified the combination

of these factors would have an adverse impact on the fair market value of the property outside the easement and quantified this effect in terms of dollar depreciation of the remainder.

Daley's appraisers stated the visual impact of the project and the irritating noise it generated would have the greatest effect on the market value of Rancho Jamul. Based upon the before and after figures, the opinion was given that severance damage of approximately $1,266,000 was the result. Only one of the several factors identified by the experts as having a negative impact on the fair market value of Rancho Jamul was the electromagnetic radiation generated by the project. This was first raised by the EIR introduced into evidence by SDG&E. This report indicated that several studies suggest electromagnetic radiation has a detrimental effect on humans and animals and that further investigation was advised. SDG&E introduced the decision of the CPUC with regard to the project. The CPUC found: "The results of studies reported to date on biological and health effects from electric fields are inconclusive in establishing that such effects do occur. On the other hand, it has not been clearly demonstrated that such effects do not occur. If they do, in fact, occur, experts are not in agreement that they pose a potential biological or health hazard."

Upon this basis, Daley's expert included "public fears" of the health hazards as one of the characteristics of the project which would have a negative impact on the value of Daley's remaining property.

## II

██ It is to this testimony and court ruling thereon that SDG&E directs its claim of reversible error. SDG&E's opening brief erroneously suggests the only basis for the jury's award of severance damage was the testimony concerning the electromagnetic controversy. The record demonstrates this was but one aspect of the large presentation of facts relating to the project which increased the severance damages awarded.

██ The admission of expert testimony concerning severance damage in a condemnation case is a matter largely within the discretion of the trial court. (*Pacific Gas & Elec. Co.* v. *Hufford, supra,* 49 Cal.2d at p. 563.) Only evidence which is "clearly speculative," wholly guesswork and conjectural "is inadmissible." (*City of Los Angeles* v. *Decker* (1977) 18 Cal.3d 860, 868 [135 Cal.Rptr. 647, 558 P.2d 545].) Any evidence which may be fairly considered as "shedding light" on the market value of the property will be admitted. (*South Bay Irr. Dist.* v. *California-American Water Co.* (1976) 61 Cal.App.3d 944, 991 [133 Cal.Rptr. 166].) A trial court's ruling on the admissibility of valuation evidence will not be disturbed on appeal in the absence of a clear showing of abuse of discretion. Daley's claim of

diminished value of the remainder was in part based upon the immediate damage to his property caused by the public's fear of electromagnetic radiation and some speculative claims of damages to be suffered in the future as a result of the damage of radiation itself.

Daley did not claim the jury could award severance damages based upon some possible adverse effects of *electromagnetic radiation on a property*. Rather, the basis of his claim was, among other things, a calculated diminution of the present market value of the property as the result of the public's fear of electromagnetic radiation. Such a distinction has been recognized in several courts. (Cf. *City of Salinas* v. *Homer, supra,* 106 Cal.App.3d 307.) The jury award here was not based upon any speculation that the electromagnetic fields do in fact cause biological hazards to humans or animals.

Several jurisdictions, perhaps a majority, have recognized that buyer fear of the potential dangers associated with power lines, electromagnetic radiation in particular, have a depressing effect on the market value of adjacent properties. Such cases hold that the resultant diminution in value is compensable. In the much cited case of *Willsey* v. *Kansas City Power* (1981) 6 Kan.App.2d 599 [631 P.2d 268], the Kansas court held: "There can be no quarrel with the proposition that 'mere fears' of injury cannot be compensated. That accords with the universal rule against remote, speculative and conjectural damages. If injury should occur at some future time, that would be the occasion to determine whether and to whom there is liability.

". . . . . . . . . . . . . . . . . . . .

". . . As we see it, in any condemnation case the objective is to compensate the landowner for damages actually suffered. Remote, speculative and conjectural damages are not to be considered; the owner cannot recover today for an injury to his child which he fears will happen tomorrow. *Logic and fairness, however, dictate that any loss of market value proven with a reasonable degree of probability should be compensable, regardless of its source*. If no one will buy a residential lot because it has a high voltage line across it, the lot is a total loss even though the owner has the legal right to build a house on it. If buyers can be found, but only at half the value it had before the line was installed, the owner has suffered a 50% loss. If this kind of lost market value is proven to the satisfaction of the jury we see no reason why the landowner should bear the loss rather than the customers for whose benefit the loss is inflicted." (631 P.2d at pp. 277-278; italics added.)

The *Willsey* decision is a review of the positions taken in various courts throughout the country in response to this claim of electromagnetic damage to the remainder property. In *Florida Power & Light Co.* v. *Jennings* (Fla. 1987) 518 So.2d 895, 899, the court held that evidence of the existence of

buyer fear of electromagnetic radiation and its effect was admissible on the issue of severance damage. (See also *Selective Resources* v. *Superior Court* (1984) 145 Ariz. 151 [700 P.2d 849, 852]; *United States* v. *760.807 Acres of Land* (9th Cir. 1984) 731 F.2d 1443, 1447.) A similar view was expressed in a widely quoted federal court of appeals case, *Hicks* v. *United States* (6th Cir. 1959) 266 F.2d 515, where the federal court held "[t]he apprehension of injuries to person or property by the presence of power lines on the property is founded on practical experience and may be taken into consideration in so far as the lines and towers affect the market value of the land. [Citation.]" (*Id*. at p. 521.)

Perhaps most significant among the courts which adopt the view of the Kansas, Florida, other state courts and the federal court is the California case of *Pacific Gas etc. Co.* v. *W. H. Hunt Estate Co.* (1957) 49 Cal.2d 565 [319 P.2d 1044]. This case approved admitting evidence on the showing that the fear of danger exists and affects market value. The reasonableness of the electromagnetic theory is either assumed or is deemed irrelevant. In *W. H. Hunt Estate,* the court concluded: *that a line carrying 220,000 volts of electricity is a dangerous instrumentality is a fact too "commonly known to be disputed."* (*Id*. at p. 572, italics added.) On page 573, the court addressed severance damage, stating: "No reasonably prudent person should be expected to purchase the land here in question without giving heed to the potentials of plaintiff's power line as well as practical uses of the land beneath and surrounding it, and the possible effects of the hazard upon the uses for which the land was otherwise suitable. No abuse of discretion has been shown in receiving the evidence of which plaintiff complains."

In *W. H. Hunt Estate,* as in the case at bench, the defendant's valuation witness said in reaching his severance damage figure that he had taken into consideration seven or eight other factors causing diminution in value. In *Pacific Gas & Elec. Co.* v. *Hufford, supra,* 49 Cal.2d at p. 561 (a companion case to *W. H. Hunt Estate, supra*), the same valuation problem was present. The Supreme Court said: "By contrast Bryant's testimony in the present case referred only to elements which, in his experience as a real estate broker dealing in ranch and agricultural properties in Shasta County, prospective purchasers of defendants' property would take into consideration— elements which he testified had a bearing on the market value of defendants' property both before and after being impressed with the easements sought by plaintiff. He made it clear that he was not basing his estimate of value on any assumption as a fact of that which he recognized was a mere possibility; rather, he simply mentioned the possibility as something which a prospective buyer would consider. He repeatedly mentioned that he had not assigned separate sums for each of the elements of market value and of severance damage which he had considered, but that they had entered as a

whole in the final amounts to which he testified. This approach was correct." (*Ibid.*)

■ The trial court here was correct in its analysis and determination that the truth or lack of truth in whether electromagnetic projections caused a health hazard to humans or animals was immaterial. Rather the question was whether the fear of the danger existed and would affect market value. As was said in *United States* ex rel. *T.V.A.* v. *Easement and Right of Way* (6th Cir. 1968) 405 F.2d 305 (reaffirming prior views), "Since the *Hicks* case was decided, nearly ten years ago, TVA has conducted numerous safety studies and has concluded from them that apprehension of injuries is not founded on practical experience and should not be considered in awarding incidental damages. The TVA studies conducted on this issue are also credible. However, in the final analysis, we are concerned only with market value. Although these studies may show objectively the complete safety of these structures, we are not convinced that certain segments of the buying public may not remain apprehensive of these high voltage lines, and therefore might be unwilling to pay as much for the property as they otherwise would." (405 F.2d at p. 309.)

Cases which follow the federal rule as well as the California rule of *Pacific Gas etc. Co.* v. *W. H. Hunt Estate Co., supra,* 49 Cal.2d 565, include *Arkansas Power & Light Co.* v. *Haskins* (1975) 258 Ark. 698 [528 S.W.2d 407]; *Southern Indiana Gas and Electric Co.* v. *Gerhardt* (1961) 241 Ind. 389 [172 N.E.2d 204]; *Evans* v. *Iowa Southern Utilities Co.* (1928) 205 Iowa 283 [218 N.W. 66]; *Claiborne Electric Cooperative, Inc.* v. *Garrett* (La.App. 1978) 357 So.2d 1251; *Colvard* v. *Natahala Power & Light Co.* (1933) 204 N.C. 97 [167 S.E. 472]; *Ohio Public Service Co.* v. *Dehring* (1929) 34 Ohio App. 532 [172 N.E. 448]; *Oklahoma Gas & Electric Co.* v. *Kelly* (1936) 177 Okla. 206 [58 P.2d 328]; *Basin Electric Power Cooperative, Inc.* v. *Cutler* (1974) 88 S.D. 214 [217 N.W.2d 798]; *Appalachian Power Co.* v. *Johnson* (1923) 137 Va. 12 [119 S.E. 253]; and *State* v. *Evans* (1980) 26 Wn.App. 251 [612 P.2d 442]. We conclude reason and case authority support the trial court's rulings in admitting evidence as to the conflict regarding any health hazard and its effect on property value and in refusing to permit a mini-trial on the truth or lack of truth of the particular controversy.

### III

■ In its reply brief, SDG&E asserts "[t]he inferred dangers of electromagnetic radiation speculation was additionally compounded by the closing argument of Daley's attorney, suggesting that there was some association between the electromagnetic fields and asbestos and other hazardous materials." This argument, SD&GE claims, compounded the error in allowing

the testimony of the controversy surrounding electromagnetic fields and thus, had a prejudicial impact on the jury's verdict.

Having reviewed the transcript of closing argument, we conclude there is no merit to this assertion. SDG&E's attorney objected when Daley's counsel told the jury in closing argument: "I don't think there is any evidence to tell us there is no health hazard. I do recall Mr. Johns testified he read more than—he read the environmental impact report, the PUC finding, and read the articles from the Library of Congress. Also, he had spoken to a Dr. Beck. Doesn't prove anything one way or the other, but he read more than an omni. He's a responsible planner. You can decide for yourself whether you think he's on the right or wrong track. Damages to the property are a lot greater than what Mr. Williams described. Sure, he may be in the forefront, but wouldn't we like somebody in the forefront years ago on toxic waste or asbestos, and how many agencies approved toxic waste."

SDG&E's counsel objected on the ground there was no evidence to compare toxic waste with electricity. He stated: "We have no residual effect of electricity in the human body, and it's very prejudicial for him to have argued this already and he should be sanctioned for it." Daley's counsel stated he was responding to the argument that a governmental agency's approval of such activities makes those activities acceptable. The court cautioned Daley's counsel to avoid referring to matters which in time have proven to be wrong because that would be getting into the validity or invalidity of the controversy. The court then overruled the objection.

The reference to asbestos was an inappropriate comparison to electromagnetic radiation because the issue was not whether electromagnetic radiation was in fact detrimental to humans and animals. However, the point Daley's counsel was trying to make was that even though the government sanctions certain activities, those activities may eventually prove to be harmful. In this context, the statement was a fair comment on the state of the case. (See *Tobler* v. *Chapman* (1973) 31 Cal.App.3d 568, 574 [107 Cal.Rptr. 614].)

Moreover, the statement did not rise to the level of attorney misconduct requiring reversal. Statements by counsel are not evidence and the jury here was given this standard instruction. (BAJI No. 1.02.) "In the absence of irremedial misconduct, any prejudice is deemed cured by appropriate instructions from the court." (*Tobler* v. *Chapman, supra,* 31 Cal.App.3d at p. 576.)

Further, the trial court overruled the objection, implying there was no prejudicial misconduct. The court was in the best position to observe the demeanor of the parties and to guage any possible effect the statement may

have had on the jury. Thus, there was no prejudicial misconduct warranting reversal of the judgment.

## IV

One further factual situation points to an affirmance of the judgment. As noted above, the trial court suggested the use of special verdict forms in this case to tailor the issues for appellate court review and to allocate specific amounts of damages to specific claims of severance damage. Daley prepared a special verdict form for such use. The form was rejected by SDG&E. This form would have established the extent to which the jury relied upon the alleged erroneously admitted evidence (although we have found it to be properly admitted) thereby allowing an assessment of prejudice to SDG&E as a result of the claimed error. SDG&E's rejection of the suggestion constitutes a waiver of any alleged error. As was stated by Justice Friedman in *Chabot* v. *Meredith* (1971) 15 Cal.App.3d 950, 958 [93 Cal.Rptr. 543], "We should not permit the tactical choices of trial counsel to force abstract issues upon us. Rather, we should utilize opportunities to force counsel into requesting special verdicts. . . . The responsibility rests with the party who will lose the verdict." (See also *McCloud* v. *Roy Riegels Chemicals* (1971) 20 Cal.App.3d 928, 936-937 [97 Cal.Rptr. 910].)

Most enlightening on this point and binding upon this court is the decision in *Pacific Gas & Elec. Co.* v. *Hufford, supra,* 49 Cal.2d at page 561. As the Supreme Court pointed out, the expert (repeatedly) mentioned he had not assigned separate sums for each element of market value and severance damage which he had considered but they were entered as a whole in the final amounts to which he testified. This approach was correct. We conclude not only was there no error made in the admission of the evidence challenged here, but the procedure and testimony or approach of Daley's expert witness was correct. Absent the use of special verdicts we cannot approach the issue.

## V

Finally, SDG&E contends Daley is not entitled to his litigation expenses on this appeal. In this contention SDG&E is in error. The statute clearly authorizes costs on appeal to the condemnee here. (§ 1235.140, subd. (b).) In light of our finding no merit in SDG&E's contentions to require reversal, litigation expenses incurred are also recoverable.

The trial court found that SDG&E's final offer of compensation was unreasonable and awarded attorney's fees and litigation expenses. Here, there is more than substantial evidence to support the trial court's finding

that SDG&E's offer of compensation was unreasonable. Daley's demand for compensation was more than reasonable.

General guidelines have been developed to aid trial courts in determining the reasonableness or unreasonableness of the offer. (See *Community Development Agency* v. *Krause* (1984) 162 Cal.App.3d 860, 866 [209 Cal.Rptr. 1].) They are (1) the difference between the offer and the compensation awarded, (2) the percentage of difference between the offer and award, and (3) the good faith, care and accuracy in how the amount of offer and amount of demand respectively were determined. (See *State of California* ex rel. *State Pub. Works Bd.* v. *Turner* (1979) 90 Cal.App.3d 33, 37 [153 Cal.Rptr. 156].) On looking at the first test, the amount of difference in offer and compensation actually awarded, it appears SDG&E's offers were grossly unreasonable. SDG&E's first statutory offer was only 23.5 percent of the actual award made by the jury and its second statutory offer was only 29.4 percent of the actual award made, or $1.2 million less than the actual award made. These enormous differences represent unreasonable offers as a matter of law. (*City of Gardena* v. *Camp* (1977) 70 Cal.App.3d 252 [138 Cal.Rptr. 656]; *Redevelopment Agency* v. *First Christian Church* (1983) 140 Cal.App.3d 690 [189 Cal.Rptr. 749].) A reasonable offer was made in *Los Angeles Unified Sch. Dist.* v. *C.F. Bolster Co.* (1978) 81 Cal.App.3d 906 [146 Cal.Rptr. 789], where the offer was 87 percent of the jury's final award with a dollar difference of $39,000. Here, the percentage differential alone casts doubt on the reasonableness of SDG&E's offer.

Finally, we are asked to conclude SDG&E failed to exercise due care or act in good faith in preparing its offer. To reach such a conclusion it is necessary to ascertain how the condemning agency considered the appraisal of the land owner's expert in preparing its final offer. (See *County of Los Angeles* v. *Krantz* (1977) 65 Cal.App.3d 656, 660 [135 Cal.Rptr. 473].) Here the disagreement between the experts related to severance damage at the outset. There was a difference between $60,000 and $1.2 million in the two appraisals. In such circumstances the parties were obligated, if they were to be reasonable in their conduct, to consider the appraisals of the other and failure to do so warrants a determination that good faith was not shown. (See *City of Gardena* v. *Camp, supra,* 70 Cal.App.3d at pp. 257-258.)

The original appraisals of the property obtained by SDG&E analyzed severance damages averaging $287,000 plus interest. This barely exceeded SDG&E's first and minimum offer of $330,000. Even more enlightening is evidence concerning exchange of valuation data. Daley voluntarily elected to supply his entire appraisal reports to SDG&E on January 7, 1985, three months before the exchange was due. SDG&E, in contrast, despite promises, did not exchange valuation data until the very last instant possible before the original May 7, 1985, trial date. Thus SDG&E fails under

each of the three guidelines used to evaluate the reasonableness or unreasonableness of its settlement offer. More than substantial evidence supports the trial court's finding in this regard.

We conclude the offer by SDG&E was in fact unreasonable and the offer by Daley was reasonable. Therefore, litigation expenses were properly awarded at trial. ■ Pursuant to statute and long established, unchallenged case law, litigation expenses on appeal are proper. The leading case on this subject is *Lake County Sanitation Dist.* v. *Schultz* (1978) 85 Cal.App.3d 658, 673-674 [149 Cal.Rptr. 717], where the court said: "Finally, there can be no question that Schultz are also entitled to their costs and attorney fees on this appeal. The statute specifically refers to 'any subsequent judicial proceedings' in the condemnation action and the substantially identical language of subdivision (c)(2) of former section 1255a has been held to apply to attorney fees on appeal (*Decoto School Dist.* v. *M & S Tile Co.,* 225 Cal.App.2d 310 [37 Cal.Rptr. 225]; and *Orange County Mun. Water Dist.* v. *Anaheim Union Water Co.,* 247 Cal.App.2d 761, 764 [56 Cal.Rptr. 464])."

This rule of allowing litigation costs on appeal was in effect before the statutory enactment.

More recent cases allow costs on appeal in situations similar to this without comment. (See *City of Commerce* v. *National Starch & Chemical Corp.* (1981) 118 Cal.App.3d 1, 21 [173 Cal.Rptr. 176]; *Community Redevelopment Agency* v. *Krause* (1984) 162 Cal.App.3d 860, 868 [209 Cal.Rptr. 1].) ■ While this court may assess litigation expenses, "the trial court is the proper forum for the determination of attorney's fees incurred in connection with this appeal." (*Lake County Sanitation Dist.* v. *Schultz, supra,* 85 Cal.App.3d at p. 674.)

## DISPOSITION

Judgment is affirmed. The trial court, upon hearing, shall determine the litigation expenses of Daley caused by this appeal.

Kremer, P. J., and Benke, J., concurred.